**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:13-CR-141 |
| | ) |
| vs. | ) |
| | ) |
| Glen Galemmo, | ) |
| | ) |
| Defendant. | ) |

O R D E R

This matter is before the Court on cross-motions for summary judgment filed by Claimant Kristine Galemmo (Doc. No. 107) and the United States (Doc. No. 108). For the reasons that follow, Claimant's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**; the government's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.

I. Background

Glen Galemmo ran a Ponzi scheme which defrauded some 141 victims of over of $34,000,000. The details of Galemmo's Ponzi scheme are set out at length in the statement of facts accompanying his plea agreement (Doc. No. 2, at 10-13) and need not be repeated here. The basics of the scheme are familiar - Galemmo solicited money from individuals for fictitious investment opportunities, created fictitious account statements to give the appearance that the investments were generating positive returns, and paid "returns" to older investors with the funds of newer investors. In the meantime, Galemmo diverted the investors' money for his personal use.

1

In January 2014, Galemmo pleaded guilty to a two-count criminal information charging him with wire fraud, in violation of 18 U.S.C. § 1343, and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  Galemmo's plea agreement also required him to forfeit certain property the government.  Galemmo came before the Court for sentencing on September 2, 2014.  The Court (Weber, J.) sentenced Galemmo to 188 months of imprisonment on each count, to be served concurrently, and 3 years of supervised release on each count, to be served concurrently.  The Court also ordered Galemmo to pay restitution of $34,599,085.46 to his victims.

Finally, the Court ordered Galemmo to forfeit the following property to the United States:

    a. Real property known and numbered as 2230 Park Avenue, Cincinnati, Hamilton County, Ohio 45206;

    b. The Contents of US Bank Account x5618 in the name of Queen City Investment Fund II ("US Bank x5618") in the amount of Four Hundred Thirteen Dollars and Ninety-Eight Cents ($413.98);

    c. The Contents of US Bank Account x8448, in the name of Queen City Holdings, LLC, ("US Bank x8448"), in the amount of Three Hundred Fifty-Two Dollars and Sixty-Four Cents ($352.64);

    d. The Contents of US Bank Account x4670, in the name of QFC, LLC, ("US Bank x4670") in the amount of Four Hundred Twenty-four Thousand Two Hundred Thirty-eight Dollars and Three Cents ($424,238.03);

    e. The Contents of Keybank Account x5922, in the name of Glen and Kristine Galemmo, ("Keybank x5922") in the amount of Thirty-Six Thousand Fifty-Nine Dollars and Twenty Cents ($36,059.20);

    f. The Contents of Dorman Trading Account x633, in the name of QFC, LLC, ("Dorman x633") in the amount of Ten Thousand Seven Hundred Seventy-Two Dollars and Thirty-Six Cents ($10,772.36);

    g. The Contents of Dorman Trading Account x695, in the name of QFC, LLC, ("Dorman x695") in the amount of Five Thousand Dollars ($5,000.00);

h. The Contents of Dorman Trading Account x696, in the name of QFC, LLC, ("Dorman x696") in the amount of One Hundred Ninety-Two Thousand Four Hundred Fifty Dollars and Twenty-Five Cents ($192,450.25);

i. The Contents of Interactive Brokers, LLC Account x016, in the name of QFC, LLC, ("Interactive x016") in the amount of Five Hundred Fourteen Thousand One Hundred Seventy-Six Dollars and Sixty-Five Cents ( $514,176.65);

j. The Contents of Interactive Brokers, LLC Account x438, in the name of QFC, LLC, ("Interactive x438") in the amount of One Thousand Seven Hundred Sixty Six Dollars and Thirty-Five Cents ($1,766.35);

k. Real property known and numbered as 1849 Madison Road, Cincinnati, Hamilton County, Ohio 45206;

l. Real property known and numbered as 6000 Royal Marco Way, Unit 454, Marco Island, Florida 34145;

m. The Contents of Key Bank Account X5628 in the name of QC Power Strategies Fund, LLC ("Key Bank X5628") in the amount of Four Hundred Forty Thousand Three Hundred Seventy Dollars and Seventy-Eight Cents ($440,370.78);

n. A 2007 GMC Yukon XL, VIN 1GKFK66897J236949, titled to Kristine Galemmo;

o. A 2007 GMC Acadia, VIN 1GKER23787J159616, titled to Kristine Galemmo;

p. A 2004 Nissan 350Z, VIN JN1AZ36A04M251517, titled to Jones-Morris Group, LLC;

q. A 2012 Audi A8, VIN WAURVAFD1CN017564, titled to QFC, LLC;

r. A 2013 Toyota Highlander, VIN 5TDDK3EH2DS194089, titled to Kristine Galemmo;

s. The Contents of First Citizens Bank Account X1609 in the name of Kristine Galemmo in the amount of One Hundred Two Thousand Twenty-Six Dollars and Ninety-Two Cents ($102,026.92);

t. The Contents of First Citizens Bank Account X3209 in the name of Kristine Galemmo in the amount of Twelve Thousand Three Dollars and Two Cents ($12,003.02);

u. $2,000 in funds held by Pensco Trust, resulting from check no. 2830 issued by QFC, LLC to Pensco Trust on June 13, 2013 (hereafter "PENSCO funds");

v. Remaining account balances in various Key Bank Accounts, as set forth below (hereafter "Key Bank Funds"):

  1. Key Bank Cashier's Check No. 400199478 in the amount of $947.60 made payable to "QC Power Strategies Fund Sweep;"

  2. Key Bank Cashier's Check No. 400199482 in the amount of $921.57 made payable to "Jones Morris Group LLC;"

  3. Key Bank Cashier's Check No. 400199479 in the amount of $6,354.64 made payable to "Sentinel Blackbox LLC;"

  4. Key Bank Cashier's Check No. 400199481 in the amount of $386.11 made payable to "Sentinel Strategy Fund, LTD;" and

  5. Key Bank Cashier's Check No. 400199480 in the amount of $231.57 made payable to "Sentinel Property Holdings LLC."

w. 45 units or shares of Rugged Power Investments, LLC ("RPI") currently issued to Kristine Galemmo;

x. all funds payable to Kristine Galemmo as distributions/profits related to shares held in Rugged Power Investments, LLC including $3,105,000 held in Rugged Power Investments, LLC's Fifth Third Bank Account X9306 and $416,250 held by the registry of United States District Court for the Southern District of Ohio Western Division (receipt nos. 100CIN022056 and 100CIN022057);

y. $250,000 that is currently held in the Rugged Power Investments, LLC's Fifth Third Bank Account X9306 that was QC Power Strategies Fund, LLC's (QC Power) initial collateral to PJM and that was returned to RPI in September 2013; and

z. All remaining funds held at PJM Settlement, Inc. or PJM Interconnection, LLC on behalf of QC Power ($50,158.02 plus any additional interest).

Doc. No. 67, at 5-8. The Court entered preliminary orders of forfeiture of this property in February and August 2014. Doc. Nos. 12, 62, 63. In conformity with the preliminary orders of forfeiture, the government published notice of its intent to dispose of the forfeited property and directing persons claiming an interest in the property to file verified claims with

4

the Clerk of Court. Doc. Nos. 23, 81. The government also provided direct notice of the preliminary orders of forfeiture to certain other persons, including Claimant Kristine Galemmo. Doc. No. 80.

The instant motions for summary judgment concern the preliminary order forfeiting Galemmo's 45 units or shares of Rugged Power Investments and the related distributions totaling approximately $3.5 million (items w & x, supra) and $28,055.03 of the $36,059.20 held in Key Bank Account X5922 (item e, supra). Claimant Kristine Galemmo, Galemmo's wife, contends that her interest in these assets is superior to the government's and hence should not be forfeited to the United States.

### A. Rugged Power Investments

The facts concerning the Rugged Power Investments ("RPI") units and distributions are undisputed.

RPI was a legitimate business established by Galemmo and two other partners to engage in wholesale electricity trading. To start the business, RPI required the partners to purchase units at $3,000 per share and also to contribute $250,000 cash for collateral. Galemmo's initial investment in RPI was for 30 units, for which he paid $90,000. Galemmo, however, used proceeds from his Ponzi scheme to fund his entire investment in RPI, including the contribution for collateral. In July 2013, after the government began seizing other of his assets, Galemmo assigned his 30 units of RPI to Claimant for no value received - he essentially quitclaimed his RPI units to Claimant.

Galemmo's partnership agreement contained a preemptive rights/anti-dilution provision which gave unit holders the right to buy additional units of RPI if the partnership decided to raise capital by issuing new shares. In November 2013, RPI decided to raise

new capital due to a new business relationship with Exion Energy, Inc. In order to maintain a 30% interest in the partnership, Claimant purchased 15 additional units of RPI at $3,000 per unit. In order to make this acquisition, Claimant borrowed $45,000 from the Locust Street Irrevocable Trust. The trust in turn was funded by a $45,000 loan that Claimant's father-in-law, Joseph A. Galemmo, Sr., gave to the trust.

Between November 2013 and March 2014, the 45 units of RPI generated distributions of approximately $3.5 million. The Court preliminarily ordered the forfeiture of all 45 RPI units and the associated distributions as property constituting or derived from proceeds traceable to Galemmo's fraudulent scheme. Doc. No. 63. It should be noted that the government has not seized, and the Court has not preliminarily ordered the forfeiture of, the $45,000 Claimant borrowed to purchase the additional 15 RPI units. Claimant contends that she is the rightful owner of the 30 original units and associated distributions, and that she is the rightful owner of the 15 additional units and associated distributions. At a minimum, Claimant contends, she is a bona fide purchaser for value of 15 units of RPI and their associated distributions. She does not claim that she was a bona fide purchaser for value of the original 30 units of RPI.

### B. Key Bank Account X5922

The facts concerning this bank account are undisputed as well.

Key Bank Account X5922 was a joint checking account owned by Galemmo and Claimant. Between June 2012 and July 2013, Galemmo deposited some $466,000 in fraud proceeds into this account. Doc. No. 108, at 39. During the same time period, Claimant deposited into the account her legitimately-earned teacher's salary of approximately $28,000.

6

It appears that Galemmo and Claimant paid many if not all of their personal and household expenses from this account. The government has presented evidence showing that the Galemmos' average monthly expenditures were $33,000 per month and that the account was overdrawn at least eight times between June 2012 and July 2013. The account was last overdrawn on March 13, 2013. Between March 13, 2013 and July 2, 2013, when the account and its contents were seized by the government, Galemmo deposited into the account $186,518.71 in fraud proceeds. During this same period, Claimant's salary of $8,216.64 was deposited into the account.

There was $36,059.20 in the account on July 2, 2013 when the government seized it. The Court preliminarily ordered the forfeiture of these funds as property constituting or derived from proceeds traceable to Galemmo's fraudulent scheme. Doc. No. 12. Claimant contends that she is entitled to recover from the seized amount $28,055.53, which represents the entire amount of her teacher's salary that was deposited into the account between June 2012 and July 2013.

## II. Procedural History

The Court's preliminary order of forfeiture conclusively establishes that the property currently at issue constitutes or was derived from proceeds of Galemmo's Ponzi scheme. United States v. Coffman, ___Fed. Appx.___, Nos. 14–5134, 14–5298, 2015 WL 2167033, at *4 (6th Cir. May 11, 2015). The title to property subject to forfeiture vests in the United States and relates back to the time of the commission of the criminal acts giving rise to forfeiture. United States v. Huntington Nat'l Bank, 682 F.3d 429, 433 (6th Cir. 2012); 21 U.S.C. § 853(c). The issue in these ancillary proceedings is whether Claimant has an interest in the subject property that is superior to the government's or whether Claimant is

7

a bona fide purchaser for value of the property without cause to believe the property was subject to forfeiture.  United States v. Huntington Nat'l Bank, 574 F.3d 329, 331 (6th Cir. 2009); 21 U.S.C. § 853(n)(6).  The claimant bears the burden of proof under § 853(n)(6). Coffman, 2015 WL 2167033, at *6.

As indicated, Claimant filed a petition claiming an interest in 45 units of RPI and the related distributions, and in $28,055.53 of the $36,059.20 seized from Key Bank Account X5922.  The parties conducted additional discovery on Claimant's claims and have filed cross-motions for summary judgment that are now ripe for disposition.

III. Summary Judgment Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers.  The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts.  Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992).  Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that

8

there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  <u>Anderson</u>, 477 U.S. at 249.  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  <u>Id.</u> at 250.  "If the evidence is merely colorable, . . .  or is not significantly probative, . . . the court may grant judgment."  <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

IV. <u>Analysis</u>

A. <u>RPI Units and Distributions</u>

First at issue are the 45 units of RPI and the associated distributions.  Claimant contends that her interest in all of the units and distributions is superior to the government's but that at a minimum she is a bona fide purchaser for value of 15 RPI units.  With regard to the latter argument, Claimant points out that she purchased the 15 units with money untainted by Galemmo's fraud.  The government, on the other hand, argues that its right to the original 30 units of RPI is superior to Claimant's and that she was only able to purchase the additional 15 units because of Galemmo's fraudulent conveyance to her of the original units.  In other words, according to the government, while Claimant used her funds to acquire the 15 units, the actual right to purchase the units belonged to it.  The government also contends that Claimant fails as a bona fide purchaser for value of the 15

9

units because she had cause to believe that the RPI units were subject to forfeiture to the government.

There really cannot be a serious argument that Claimant's interest in the original 30 units of RPI is superior to the government's interest. Under the relation-back doctrine, the government acquired the title to these units and the distributions on the date that Galemmo used the proceeds of his fraud to establish and invest in the Rugged Power limited partnership. 21 U.S.C. § 856(c). This date obviously predates the date Galemmo purported to transfer these 30 units to Claimant.

Galemmo's fraudulent conveyance of the 30 units to Claimant did not terminate the government's title. Coffman, 2015 WL 2167033, at *9. Whether property subject to forfeiture was fraudulently conveyed by the defendant is determined according to state law. Id. Regarding fraudulent transfers, the Ohio Revised Code provides:

> (A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor;
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:
>
> (a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;
>
> (b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
>
> (B) In determining actual intent under division (A)(1) of this section, consideration may be given to all relevant factors, including, but not limited to, the following:

(1) Whether the transfer or obligation was to an insider;

(2) Whether the debtor retained possession or control of the property transferred after the transfer;

(3) Whether the transfer or obligation was disclosed or concealed;

(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;

(5) Whether the transfer was of substantially all of the assets of the debtor;

(6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

Ohio Rev. Code. § 1336.04.  In this case, the record indisputably shows that Galemmo's conveyance of these units was fraudulent under § 1336.04(A)(1).

A fraudulent conveyance may be established by proof of as few as three "badges of fraud."  Blood v. Nofzinger, 834 N.E.2d 358, 368-69 (Ohio Ct. App. 2005).  Not all of the § 1336.04(B) factors are applicable in this case, but a number of them of them stand out strongly.  First, Galemmo transferred the RPI units to an insider, his wife, the Claimant.  See Ohio Rev. Code § 1336.01(G)(1)(a) (in relevant part, defining "insider" as a "relative of the debtor[]"); Reinbolt v. Kern, No. WD–12–041, 2013 WL 1390607, at *9 (Ohio Ct. App.

Apr. 5, 2013)("Linda Kern's transfer of property was to her then-husband, an insider under R.C. 1336.01(G)(1)(a)."). Second, Galemmo concealed the fact that he had assigned his RPI units to Claimant during the proffer he gave to the government about a month after the assignment. Shorten Dec. ¶ 5; Ohio Rev. Code § 1336.04(B)(3)("Whether the transfer or obligation was disclosed or concealed at the time[.]").[1] Third, at the time Galemmo transferred the RPI units to Claimant, the government had already begun seizing other of his bank and trading accounts. Shorten Dec. ¶ 4. See Ohio Rev. Code § 1336.04(B)(4)("Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit[.]"). Fourth, Claimant gave no value to Galemmo in exchange for the assignment of the units. See Ohio Rev. Code § 1336.04(B)(8)("Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred[.]"); Blood, 834 N.E.2d at 369 ("The lack of a reasonable value given in exchange . . . establishes the eighth badge of fraud.")(citing § 1336.04(B)(8)). Fifth, and finally, as even Claimant appears to concede, the government's seizure of Galemmo's assets left him insolvent.[2] Ohio Rev. Code § 1336.04(B)(9)("Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred[.]").

---

[1]    Contrary to Claimant's assertion, Agent Shorten's declaration is not hearsay on this point because it is not being offered to prove the truth of the matter asserted. Shorten, rather, is offering Galemmo's omission or failure to disclose a material fact concerning his assets as circumstantial evidence of his state of mind and/or intent to fraudulently conceal assets from the government. Shorten's declaration, therefore, is not hearsay. United States v. Salameh, 152 F.3d 88, 112 (2nd Cir. 1998).

[2]    See Doc. No. 107 (Claimant's motion for summary judgment),at 4-5 (stating that Galemmo's prosecution and conviction decimated her financial condition).

Additionally, Galemmo closed the business that was the front for the Ponzi scheme only ten days after transferring the units to Claimant - another sign of his insolvency.

In summary, at least five badges of fraud surround Galemmo's assignment of the 30 RPI units to Claimant. The transfer was to an insider. Galemmo concealed the transfer from the government. At the time of the transfer, the government had already begun seizing other of Galemmo's assets. Claimant did not give value in exchange for the units. Galemmo became insolvent after the transfer occurred. This is sufficient to find that Galemmo's conveyance of the 30 units to Claimant was fraudulent. E.g., Gevedon v. Ivey, 876 N.E.2d 604, 616-17 (Ohio Ct. App. 2007); Blood, 834 N.E.2d at 368 (an inference of fraud arises upon demonstration of a sufficient number of "badges").

Claimant has not adduced any proof that Galemmo's transfer of the 30 units to her was innocently done. See Blood 834 N.E.2d at 368 (after inference of fraud arises, burden shifts to transferee to prove that transfer was not fraudulent). She argues that Galemmo's criminal activity had ceased when the transfer occurred and that she is an innocent owner of the units because she was unaware of Galemmo's criminal activities. These arguments are irrelevant, however. As the government correctly argues, the issue is not whether Galemmo's criminal activity had ceased by the time of the transfer. In the same vein, the issue is not whether Claimant is an innocent owner of the units and distributions because she had no knowledge of Galemmo's criminal activities. Section 853(n) does not provide an innocent owner defense wherein the owner's unawareness that the property was used in criminal activity excuses the property from forfeiture. See United States v. Alcaraz-Garcia, 79 F.3d 769, 773 (9th Cir. 1996)(noting that the Calero-Toledo innocent owner defense "does not apply where the forfeiture statute at issue supplies its own

13

requirements to enable an innocent owner to challenge the forfeiture");[3] United States v. Jimerson, 5 F.3d 1453, 1455 (11th Cir. 1993) ("Section 853, however, does not contain an innocent owner provision; as a result, her alleged innocence, standing alone, cannot defeat the Government's interest in criminally forfeited property."); compare to 18 U.S.C. § 983(d) (setting forth innocent owner defense in civil forfeiture proceedings). Section 853(n), rather, requires Claimant to demonstrate her "innocence" by proving that her title in forfeited property is superior to the government's or that she is a bona fide purchaser for value of the property. Here, Claimant rejects reliance on the latter and has not adduced evidence on the former. Consequently, title to the 30 units, and their distributions, relates back to the government.

A closer question is presented with regard to the 15 additional units purchased by Claimant and the distributions related to those units. Claimant contends that because she purchased those units with "innocent funds" - the loan from her father-in-law - her title in the units and distributions is superior to the government's and/or that she is a bona fide purchaser for value of the units. The government, however, contends that Claimant only had a right to purchase additional RPI units because of Galemmo's fraudulent conveyance of the original 30 units. According to the government's theory, since the title to the 30 units relates back to the government, the right to purchase the additional 15 units also relates back to the government. Since the right to purchase the additional units relates back to the

---

[3]     In Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 689 (1974), the U.S. Supreme Court stated that an owner could defeat civil forfeiture by proving that "he was uninvolved in and unaware of the wrongful activity . . . [and] that he had done all that reasonably could be expected to prevent the proscribed use of his property."

government, the title to the units, as well as the distributions, relates back to the government as well.

As just explained, the title to the original units is vested in the government under the relation-back doctrine.  Since the title to those units relates back to the government, it follows logically that all of the rights appurtenant to owning the units, including the preemptive rights provisions, relate back to the government as well.  On the other hand, as Claimant correctly argues, the new units were purchased with funds that indisputably were not proceeds of Galemmo's fraud, a fact which nominally suggests a title superior to the government's.  This appears to be a sui generis situation - the government had title to 30 units and the right to purchase 15 more units, but a third-party exercised the government's right to purchase the additional units, and in fact purchased the additional units with untainted funds that she supplied.  The Court concludes, however, that Claimant has not established either a superior title to the 15 units or that she is a bona fide purchaser for value of the 15 units.  Consequently, title to the 15 units and their distributions remains vested in the government.

First, as set out above, § 853(n)(6)(A) requires Claimant to prove that her title in the forfeited property is superior to the government's.  As just decided, the title to the 30 units and the rights appurtenant to those 30 units relates back to the government.  Claimant, therefore, never had the right to purchase more units under the preemptive rights provision of the partnership agreement.  21 U.S.C. § 853(n)(6)(A) (claimant's interest in property must be superior to the government's "at the time of the commission of the acts which gave rise to the forfeiture of the property under this section").  Claimant, in other words, usurped

15

what in actuality were the government's preemptive rights to purchase additional RPI units. Her title to those units, therefore, is not superior to the government's.

Second, Claimant is not a bona fide purchaser for value of those additional units because, although she indeed gave value, the record conclusively shows that she had reason to believe that the units were subject to forfeiture to the government. 21 U.S.C. § 853(n)(6)(B):

1. The original assignment of the 30 units of RPI from Galemmo to Claimant contained a provision deeming the assignment null and void if the government demanded a reversal of the assignment. Doc. No. 108, Ex. 6. This provision should have alerted Claimant that Galemmo's participation and investment in the RPI partnership was subject to investigation and seizure by the government. This is particularly true given that the government had already begun seizing Galemmo's other bank and trading accounts by the time the assignment was executed.

2. At the time Galemmo executed this assignment, he was also transferring numerous other assets, such as cars, into Claimant's name. This should have alerted Claimant that Galemmo in general was attempting to conceal assets from the government and his investors.

3. During this period, Claimant was busy opening and closing various bank accounts and running money into and out of these accounts. This behavior is consistent with a person either trying to conceal funds from the government or make it harder to trace the source of the funds. It also indicates a general awareness on the part of Claimant that the government was or would be in the process of seizing Galemmo's assets.

16

4. At around the same time, Claimant admitted she was concerned that the government was seizing Galemmo's assets. For instance, as pointed out by the government, Claimant testified that she was concerned that she would arrive at Galemmo's condominium in Florida only to find that it had been seized by the government.

The totality of the circumstances in this case demonstrates that Claimant knew or should have known that Galemmo's interests in RPI were subject to forfeiture to the government. Accordingly, she does not qualify as a bona fide purchaser for value of the 15 units under 21 U.S.C. § 853(n)(6)(B). Moreover, upholding forfeiture of all of Galemmo's RPI interests to government best serves the purposes of criminal forfeiture. 21 U.S.C. § 853(o) ("The provisions of this section shall be liberally construed to effectuate its remedial purposes."). Were the Court to conclude that Claimant was entitled to all of the RPI units and distributions, Galemmo would profit from both the original fraud (because the distributions would presumably be used to support his family) and his fraudulent conveyance of these units to Claimant. Additionally, Galemmo would be able to avoid or mitigate, at least in part, the punishment imposed by the Court for his substantive offenses. See, e.g., United States v. Hampton, 732 F.3d 687, 691 (6th Cir. 2013)(indicating that the twin purposes of forfeiture are to sanction the defendant and to divest him of ill-gotten gains). That outcome would not be acceptable.

Accordingly, the Court concludes that pursuant to 21 U.S.C. § 853(n)(6), Claimant's title to the 45 units of RPI and the related distributions is not superior to the government's, nor is she a bona fide purchaser for value of those units. The government, therefore, is entitled to summary judgment as to Claimant's claim to these assets, and as a

consequence, Claimant's motion for summary judgment as to these assets must be denied.

B. Key Bank Account X5922

This was a joint checking account owned by Claimant and Galemmo. The government seized $36,059.20 from this account as proceeds of Galemmo's fraud. Claimant claims that $28,055.03 of the amount seized is untainted funds from her teacher's salary. She, therefore, claims superior title to $28,055.03. The government, however, contends that the vast majority of the money that went into the account was proceeds from Galemmo's fraud and that Galemmo and Claimant dissipated essentially all of the money in the account. Therefore, according to the government, Claimant's title to the claimed amount is not superior to its title to the funds. At most, the government contends, Claimant is entitled to recover only a small percentage of the seized funds representing the proportionate share of her salary that was deposited into the account after the date it was last overdrawn in March 2013.

It is not disputed that Claimant's teacher's salary went into this account and that it represents untainted money which would otherwise not be subject to forfeiture to the government. It is also not disputed that Claimant's salary was commingled with the proceeds from Galemmo's fraud. Untainted or innocent funds can be forfeited to the government if there is proof that the defendant commingled the funds with fraud proceeds in order to conceal the nature or source of the tainted funds. United States v. Coffman 574 Fed. Appx. 541, 561 (6th Cir. 2014). Here, however, it does not appear that Galemmo commingled fraud proceeds with Claimant's legitimate salary in order to conceal the nature or source of the tainted funds. Indeed, it would have been nearly impossible to do so since,

18

as the government points out, the fraud proceeds deposited into the account dwarf Claimant's salary. It appears rather that Claimant and Galemmo used this account to pay their living expenses. Accordingly, the Court concludes that the entire amount seized is not forfeitable to the government. In other words, Claimant should be entitled to recover from the account funds derived from an innocent source.

On the other hand, Claimant is not entitled to recover all of her salary that was deposited into the account. As the government correctly argues, Claimant's claim to $28,055.53 wrongly assumes that she and Galemmo saved her entire salary and disbursed only fraud proceeds from the account. This argument is belied, however, by the fact that the account was overdrawn numerous times through March 2013. Claimant and Galemmo, in other words, spent everything in the account, and then some, including tainted and untainted funds. For lack of a better characterization, Claimant clearly was able to exercise her ownership rights over the untainted funds through the date of the last overdraft.

In order to reasonably estimate what amount of the $36,059.20 represents untainted funds belonging to Claimant, the correct starting point is March 13, 2013, the date the account was last overdrawn. This is the correct starting point because, as just stated, the record shows that Claimant and Galemmo spent all of the untainted funds prior to this date. According to records introduced by the government, between March 13, 2013 and July 2, 2013, the date account was seized, $186,518.71 in fraud proceeds was deposited into the account and $8,216.64 of Claimant's salary went into the account. Doc. No. 108, at 19-22. Consequently, Claimant's salary represented about 4.26% of the deposits into the account between March and July. In is reasonable to assume that Claimant and Galemmo spent tainted and untainted funds in the same proportion, i.e., of every dollar spent from the

19

account, about 96 cents was fraud proceeds and 4 cents was Claimant's salary. The Court concludes, therefore, that of the $36,059.20 seized by the government, 4.26%, or $1,536.12, represents funds from an innocent source to which Claimant has a superior title.

The Court, therefore, grants Claimant's motion for summary judgment to the extent that she is entitled to $1,536.12 but it is denied to the extent she claims $28,055.53. Similarly, the government's motion for summary judgment is granted to the extent that Claimant claims $28,055.53, but the motion is denied to the extent the government claims it is entitled to keep $36,059.20.

Conclusion

In conclusion, for the reasons stated above, each party's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART.**  The government's motion as to the 45 units of Rugged Power Investments and associated distributions is well-taken and is **GRANTED.**  Claimant's motion as to the 45 units of Rugged Power Investments and associated distributions is not well-taken and is **DENIED.**  Each party's motion as to Key Bank Account X5922 is **GRANTED IN PART AND DENIED IN PART.**  Claimant's motion for summary judgment is granted to the extent that she is entitled to $1,536.12 but it is denied to the extent she claims $28,055.53.  The government's motion for summary judgment is granted to the extent that Claimant claims $28,055.53, but the motion is denied to the extent the government claims it is entitled to keep $36,059.20.

The Clerk shall enter judgment accordingly.


**IT IS SO ORDERED**


Date July 20, 2015                    s/Sandra S. Beckwith
                                  Sandra S. Beckwith
                         Senior United States District Judge