Glen Galemmo,     )
          )
 Petitioner,    )
          )
v.          )  Case No. 13-cr-141
          )  (Pending) 15-cv-777
United States of America, )  Judge Sandra S. Beckwith,
          )    Senior, USDJ.
 Respondent.    )

### Petitioner's Motion to Request Production
### Of The Hard Copy Sentencing Transcript

Comes Now, Glen Galemmo, Indigent Federal Prisoner, Filing Pro Se, to Request Production of the "Hard Copy" type written transcript of the August 24, 2014 Sentencing Hearing as opposed to a DVD produced version as Petitioner is unable to utilize a DVD in his prison environment and has never had the opportunity to review the Sentencing Transcript to date as Petitioner's Plea/Sentencing Counsel abandoned him on direct appeal and never filed same, further stating the following for the record:

### A. Procedural History:

In December 2015, Petitioner properly filed a 28 USC § 2255 Motion and an In Forma Pauperis Application, neither of which have been adjudicated to date in civil # 1:15-cv-777.

From the Court's review of the Section 2255 Petition the Court is aware that one of the Three issues that Petitioner challenged was that the Court held that the loss amount and restitution amount were one and the same. Petitioner challenged on Ground 3 the victim count, loss amount, and restitution finding.

On December 9, 2015, this Court issued a show cause Order to the Government, with the Government moving to dismiss the claim due to an untimely AEDPA filing.

On March 14, 2016 this Court issued a Rule 7(b) Order under the Rules Governing Section 2255 proceedings for Interrogatories by former Defense Counsel Benjamin G. Dusing and Angela Hayden. Further ordering on March 30, 2016 an Order to produce Responsive documents.

On March 30, 2016, Counsel Hayden answering for both Counsel Dusing and herself filed the required response with an email exhibit.

On April 18, 2016 the Court issued an Order pursuant to Rule 7(c) of Rules governing Section 255 Proceedings for Petitioner to admit or deny the correctness of Trial Counsel's responses to the Court's interrogatories.

On May 5, 2016, Petitioner complied with this Court's Rule 7(c) request denying Counsels claims in a 9 page response supported by 7 exhibits of emails prior to Counsel's submission included as Exhibit 8.

On May 16, 2016, the Court accepted Petitioner's claims as being diametrically opposed to Counsel's claims, appointed Counsel, and ordered an evidentiary hearing on the timeliness of the filing, pursuant to Rule 8(c) of the Rules governing Section 2255 proceedings.

Currently the evidentiary hearing has been set but not held yet.

Petitioner has filed this discovery request at this stage supported by facts and figures derived from the Plaintiff's attorneys in Capannari, et. al. v. Galemmo, et. al., civil # 1:13-cv-00083, as he will be able to prove in both 1:13-cv-00083 and especially in 1:13-cr-141 that the client/victim testimony at the sentencing hearing was perjured based upon fraudulent Loss Statements by covering up and omitting profitable loan transactions to influence the sentencing determination in favor of both more time served and undeserved restitution records as a means of appeasing the Government from investigating the client/victim financial positions any further to expose their own fraud upon the Court.

B. <u>Statement of The Facts</u>:

1. Plaintiff's attorneys show $61,089,239.96 (See attached, Exh. 2) coming into the funds. Exhibit 2 comes directly from Defendant's deposition hearing in October 2014. The Plaintiff's attorney submitted Exhibit 1 and 2 on behalf of the clients. The Defendant had nothing to do with these numbers, however the number the Plaintiff's attorney submitted as money coming into the fund is the only number Defendant has seen over the last 3 years that is within 5-10% of the actual number. Plaintiff's claim $61 Million came into the fund. The Government claims $87 Million came into the fund. That number appears in numerous court cases. Defendant finds it impossible to believe the attorney's who represent their clients left out $26 Million in deposits made into the fund. The Defendant also finds it impossible the clients forgot about the $26 Million in deposits they made. The $87 Million claim by the Government that came into the fund is not possible and a completely misleading number. The Plaintiff's attorneys submitted these to protect themselves and certain clients, so that in the event somebody actually checked and added and subtracted numbers they would be in the ballpark. Let it be known that they have done everything possible to arrange for the number to be as high as possible. By staying within the subpoena dates, has allowed them to leave out all the withdrawals before 2007 (a 7 figure number) and actually omitting $33 Million Dollars of loans. Despite all of these efforts to inflate the number for their clients (which they have done), they are still 25% away from the Government's $87 Million Dollars they claim came into the fund. The Plaintiff's attorneys have requested the court to use number that they are fully aware to be incorrect, based on their own information they have submitted to the court.

2. In the First Quarter of 2014, Defendant was asked by Plaintiff's attorneys to come to Cincinnati to answer questions concerning certain aspects of the case. Defendant agreed to meet per discussions with his counsel. Defendant believed by providing information on the numbers, that this would assist Plaintiff's attorneys and clients. Plaintiff's attorneys agreed at the sentencing hearing they would speak to the Court concerning Defendant's efforts and willingness to provide needed information to them. The meeting lasted close to 4 hours and all questions were answered truthfully and furthermore provided then with very accurate information on why the loss amount at the low end was $7 Million with a high of $15 Million Dollars. Defendant also went as far as to

provide a ballpark number of how many net winners existed. So for Defendant's efforts the Plaintiff's group of Attorneys sent Mr. Cumming Sr., to Defendant's sentencing hearing. He mentioned nothing of the 4 hr meeting and proclaimed the complete opposite of the facts. This is not surprising since he was quoted in the Cincinnati Enquirer saying zero money from QC Power went to clients. Another completely false statement! Actual accounts and bank records show a higher percentage of the money made, went out to clients, than the signed agreements provided for. Defendant would be happy to forward copies of the bank statements to the Court showing exactly the amount of funds and to whom they went to. Sadly to say the Plaintiff's attorneys had this information, but still make the statement like that to the media. The highlight of the meeting was Mr. Cumming bragging that he was the one that called Fox News – listing claims that there was a $300 Million Dollar loss while laughing the whole time.

3. At the deposition hearing with Plaintiff's lead attorney asking specific questions directed at the clients names on their spread sheet (See attached, Exh. 2), Defendant's quote was that they were incorrect in both direction. Some clients show a greater loss that occurred and clients are missing numerous withdrawals. Defendant even went so far as to lead them in the direction where fraud has been committed. Defendant was of the opinion that despite the Government turning a blind eye to it, the Plaintiff's own attorney would go after and investigate the fraud, which has never been carried out. Defendant met with 6-8 attorneys to answer questions at the first meeting and Defendant's deposition hearing have been completely ignored. Defendant has made every effort to assist the Plaintiff's attorney, however they know that the answers to certain questions will lead to claims by certain clients to be a major problem. Knowing they cannot come close to the Government's restitution number, they entered into their claims in Exh. 1 & 2 at the deposition hearing to protect all.

4. 23(A)4 requires lead Plaintiffs or class representatives to fairly and adequately protect the class interest. Defendant would claim the complete opposite has happened, as those who were actual victims had fraud committed against them by those they believe have the fiduciary responsibility and legal responsibility to protect their rights. Provided below are a few examples.

**Example 1.**

| | Deposits | Withdrawals |
|---|---|---|
| Private Placement/Queen City Fund II | 1,374,053.05 | 1,086,000.00 |
| Loan Transactions | 3,153,000.00 | 3,395,929.50 |
| Totals | 4,527,053.00 | 4,481,929.50 |
| A loss of | 45,123.50 | |

Plaintiff's claim this client has a loss of $45,123.50. Provided for the Court is the date and Account number as well as amounts that were sent this client. See, Exhibit _3_. A total of 55 withdrawals are showing $8,276,152.50 going out to this client. How could the Plaintiff's attorneys miss $3,794,223.00 the clients received? They have left out over 30 withdrawals and ignored Millions of Dollars of profitable transactions.

**Example 2.**

| | Deposits | Withdrawals |
|---|---|---|
| Private Placement/Amounts | 675,000.00 | 957,500.00 |
| Loans | 300,000.00 | 321,000.00 |
| Totals | 975,000.00 | 1,278,500.00 |

Plaintiff's Attorney shows a gain of $303,500.00

Provided for the Court are deposits that show over $3,100,000.00 and withdrawals of over $4,200,000.00 for over a Million Dollars in gains. How do the Plaintiff's attorneys miss an additional $800,000.00 in gains? By choosing to ignore 20-30 loan transactions that were all profitable and leaving out close to $3,000,000.00 in withdrawals. (See, Exh. 4)

**Example 3.**

An additional 4 clients that represent missing withdrawals:

| | |
|---|---|
| | 2,310,057.50 |
| | 853,836.00 |
| | 437,684.00 |
| | 76,843.00 |
| Total of withdrawals | 3,680.420.50 |

Between only 6 clients the Plaintiff's attorneys leave out $10,400,000.00 to $10,500,000.00 of withdrawals. Defendant believes they have purposely left out close to 250-350 transactional withdrawals to the clients. Also note they have left out withdrawals before 2007. See, Exhibit 2 which shows the fact of zero withdrawals before 2007.

**Example 4.**

Restitution shows -$229,798.50. Plaintiff's attorneys spread sheet provided by them to the Court shows +$231,738.00. The Private Placement spread sheet shows a +$450,000.00 gain. Plaintiff's own information indicates a $461,533.50 difference in the Government's number and they have done nothing about this difference, i.e. a net winner who claims a loss and everybody stands by and watches.

**Example 5.**

Restitution shows a loss of $167,864.90. Since the reckless Plaintiff's attorneys believe it is in order to leave out all withdrawals before 2007, the Government and Plaintiff's attorney are missing numerous withdrawals for this client, one being as large as $600,000.00. Another net winner!

How does the above happen, when the Plaintiff's attorneys claim their only stake in this game is to see that the Client/Victims are repaid by ascertaining accurate losses vs. accurate deposits. Most importantly protecting actual victims from those making false claims when you choose to leave out $14.5 to $16.5 Million Dollars of withdrawals. Special treatment for a large number of individuals is an act of fraud upon the Court and those who believe the lead attorneys are acting in everybody's best interest. Those claiming to fairly and adequately protect the class interest, have full knowledge of Examples 1-5, and chose to do nothing but put on blinders. Bernard L. Madoff Inv. SEC, LLC 654 F.3d, 233, 236042 238 N.7 (2nd. Cir. 2011) – Net equity should be calculated by the amount that a customer deposited into his or her account, less any amount that he or she withdraws from the account. When is this going to occur in John Capannari, et. al. v. Glen Galemmo, et. al. Counsel's deficient performance victimized the actual victims. Having information and first hand knowledge that would conclude the restitution number is incorrect, they request the Court to use the restitution amount as the distribution method.

As for Rule 23(A)4 requiring adequacy of counsel, should be experienced on handling litigation of the type involved in the case. Attorney's at Strauss Troy and Cummins & Brown claims have successfully prosecuted securities class actions throughout the country and in Ohio and have been prosecuting this case since the summer of 2013. Defendant agrees with the experience claims but then is dumbfounded by these actions / and lack of action.

4

A.   Leaving out so many clawback defendants: These entities that exceeed the amount of principal they invested. At least 75-80 individuals and entities fit this description. Solely focusing on a small amount of net winners (Primary just Defendants family). How does an individual who received over $8,276,152.50 name never show up anywhere? For example not on the victims list and zero attempt at a clawback. Exhibit's shows the net winners and actual Dollar amounts that were sent out to them. The Dollar amounts come from the information provided to Defendant from the Government.

B.   Allowing the most outspoken clients to write off other losses not connected to the Private Placement and based on Agent Shortens testimony ... "Did you attempt to differentiate whether or not that was considered an investment in a stock versus a loan or versus some other type of Investment?", she answered NO. Some type of other Investment shouldn't be counted against the loss of the Private Placement or the loans. When instructed to wire money to another investment how does this money then become a loss of the Private Placement? Government under oath has admitted to this happening and the Plaintiff's attorneys have played along. Perhaps this is how these clients are being compensated for their continued attacks on Kris Galemmo.

C.   Two important factors in a financial case are deposits and withdrawals of funds by clients. The clients had already agreed to those set of numbers on their K-1's. Defendant can recall numerous instances when clients would call into the office to correct the numbers that were off by 50c or a few dollars (Deposits and withdrawals). The plaintiff's attorneys and government fight against using the one avenue that would show an accurate deposit and withdrawal statement that the clients had agreed to before the fund was closed. Basic math (Adding/subtracting) would lead to an embarrassing outcome for the plaintiff's clients and the government. By fighting against an actual method of setting the numbers rights, shows that nobody ever wanted accurate accounting of the investment losses and gains.

D.   Based on experience, Counsel has a complete understanding that a restitution number is not a loss number. Therefore understanding the fact that a loss calculation has never been carried out, thus allowing for zero business expenses to be subtracted over a 7 year period, actual trading losses by Rylan

5

Peters, Bill Schamp, etc have never been subtracted. The funds left on deposit and in bank accounts, the clients monies, have never been taken into consideration, along with actual investment losses. To avoid a loss number of approximately $7 Million, the Court determines a restitution number to be the loss number. Defendant believes there is zero case law to support the Court actions, and especially when there was no attempt to carry out a fair and accurate loss calculation. United States v. Bracciale, 374 F.3d 798, 1003 (11th Cir. 2004) "The District Court cannot merely speculate as to the proper amount of loss", the Court did not even speculate, and Defendant was told point blank by a Federal Judge in front of his Counsel, that if he made the Government prove the restitution number it would be very bad for him. The "Burden of Proof" has never been applied in United States v. Galemmo, nor has it been applied in John Capannari v. Galemmo. The Plaintiff's attorneys understand that a restitution number is not a loss number, knowing their own submission to the Court conflicts by Millions of Dollars with the Restitution Order, they requested the Court to distribute monies on the restitution number.

E. Allowing a client with a net worth of between $9-11 Million Dollars with between $6-7 Million accessible in 3 business days, to make the claim in writing: "He can't afford to buy his wife's Alzeihmer medicine" after which the Government submits the letter as a matter of Court record at Defendant's sentencing hearing. Who convinced an 81 year old man to lie to the Court? Furthermore allowing a client to tell the Court that he and his families lives have been destroyed by Defendant, despite taking out close to 300% more than he deposited, while only investing 1-2% of their net worth, and the husband told Defendant if the money is lost it will have zero effect on them. The client was also led to believe it was in order for her to put a picture of Defendant's 14 year old daughter on her Facebook page, and then to put a caption next to the picture of "Pathetic".

Clients sitting in the Court room listening to their names and Dollar amounts being read into the Court record (restitution number) knowing the number being read is incorrect. Defendant believes these clients were all led to believe these actions were acceptable. But once those clients realize they have been defrauded by those they believe had the Fiduciary responsibility to protect all, there will be 50 individuals willing to tell the Court who led them down this path.

Exhibit 5 shows an amount of #110,970,613.04 going out to clients. Kindly note spread sheet shows the missing amounts sent out to the individual clients. If Defendant could not confirm the information provided by the Government's CD's, bank statements, wire information and final distributions of fund monies, it was left blank, despite knowing that money was sent. Thus actually following a procedure in order to assume fraud did occur unlike the free for all procedures implemented by the government and Plaintiff's attorneys to create a false outcome. Understand the $110,970,613.04 number does not reflect all the monies sent out to clients. Between 15 and 25 entities left the Private Placement before 2007, and those Millions of Dollars are not reflected in the number. Simply adding what was left in the bank Accounts/Trading Accounts/Deposits on hold that belonged to clients, (totalling $2,227,624.29) bringing the total number to $113,198,234.33. Taking the $625,000.00 spent directly on clients business expenses/directly requested by the clients, the $2,300,000.00 taken from Rugged, sale of the Marco Island condominium of $640,000.00 provides an amount of $116,763,237.30 going out to clients. That amount is more going out than the Government claims over and over in numerous court filings ($116,000,000.00) came in. Defendant is not surprised at all, from the start Exhibit 6 demonstrates his view on the numbers.

Once the Plaintiff's attorneys started adding up their clients numbers they were fully aware of the situation. Instead of notifying the court of what they found and their clients actual numbers, they point to numbers nobody can prove, with any acceptable accounting procedures, and neither have they ever been made to. Even more importantly ("Government/Plaintiff's claims") Agent Shorten admitted to Ben Dusing that 90% of all monies that ever came into the bank accounts went back out to the clients. It would appear as if Agent Shorten was only off by 10%.

Even more alarming Plaintiff's claim to the Court that only $61,809,239.96 came into the Private Placement and $32,835,713.65 was done in loans, claiming to the Court a total of $93,294,943.61 of clients money came into Queen City Fund II. Defendant can show that $116,763,237.30 went out to clients with all understanding that Millions of Dollars more actually went out to clients. Defendant can show $23,468,293.69 more went out to clients than the Plaintiff's attorneys claim came in. The above does not include the $490,000.00 –

$525,000.00 that did go out. Defendant would therefore ask the Court as to what category does stolen money go under, and why is it that nobody will lift a finger to prosecute the individual as they have the Defendant. Defendant would also ask the Court, when more money goes out than came in $23,477,291.93, how can Plaintiff's attorney make any claims.

Agent Shorten was asked under oath ... "Did a lot of the Hedge Fund Investors do the short-term loans?" Her exact statement was "Maybe not a lot, but a handful of them". The Plaintiff's spread sheets show 43 different names. Defendant would state for the record, at least 45-48 different individuals did the short term loans. A handful means about 5 individuals at most, therefore the Government claims are only off by approx. 700-800%. The loan documents are missing other loans that were done. Millions of dollars are purposely missing from these clients for the sole purpose of inflating their loss claims. Special Agent Shorten's own sworn testimony, states that without counting the loans with the investment amount into the fund, the loss would be greater. An actual statement that is true. The Government and Plaintiff's attorneys had full knowledge by leaving out Millions of Dollars purposely from the clients loan amounts (Exhibits 1 ) would make the loss appear greater. To be very clear, loans are left off to those who are on the victim restitution sheet, thus allowing individuals to claim a greater loss while other less aggressive victims to be victimized by their own attorneys. By leaving out or just not recognizing 33 Million Dollars more than their proclaimed number of $32 Million in loans (See, Exhibit 1, submitted to the Court) as well as documents filed in CFTC v. Glen Galemmo. Case No. 1:14-cv-00738-MRB.

The Government is missing $36,281,066.64 in loans. The actual loan amount is in excess of $65,000,000.00, whereas the Government claims only $29,000,000.00. Special Agent Beth Shorten's own sworn testimony states, that without counting the loans with the investment amount into the fund, the loss would be greater. By purposely leaving out over $36,281,066.64 in loans, was just another way of inflating the restitution number. This was done purposely in order for giving Defendant an additional 68 months at the sentencing hearing. Unfortunately those leading the charge had zero ability to see these actions would hurt the actual victims. Some of the victims such as Thomas, Zawadiski, Bakelman, Gregan, Mancinin, Martin and Lengwini have been hurt because the profits made from the

loans have never been subtracted from the clients loss number. How could the profits have been accounted for when they failed to recognize them as loans. Again the Government has this information because they provided it to Defendant. How in the world do they leave out $36,281,066.64 when they had the information. They had to in order to manipulate a certain outcome. Plaintiff's attorneys have played along with the help of the Government.

Special Agent Shorten testified that the loan amount was $29 Million based on the Defendant claims. Defendant can assure the Court that he did not provide these numbers. Defendant's numbers were presented to the Court in Civil Action No. 1:14-cv-00738-MRB and additional numbers have been presented in Civil Action No. 1:13-cv-00883. Defendant would claim that these are the only two opportunities that have been given to him to put forth factual numbers. The opportunity at the sentencing hearing was blocked by the Court.

One of the individuals that came up with the $29 Million Dollar loan number committed fraud over a Seven (7) year period. This information comes from the Government's CD's they provided to Defendant, whose attorney was informed of this fact (by Defendant himself) and whose further understanding was that this same information was then presented to the Government and Prosecuting attorney by Defendant's attorney. It was made very clear to Defendant by his Counsel that there was zero interest in this individual by the authorities. Defendant is quite sure the victims would feel quite the opposite considering the individual has the financial means to pay back the fraud as held by this individual. The Government, having knowledge of the situation and understanding the position and access this individual had, still thought it was in order to testify that the loan amount was $29 Million Dollars, despite having interviewed clients who provided specific details about their loans. 10 individuals account for more than $40 Million in loans. In United States v. Galemmo it is in order to testify under oath to a number that was incorrect by over 100% as long as there was a disclaimer.

The Government, Plaintiff's attorneys and clients have full knowledge of what the correct loan numbers are. Plaintiff's attorneys and investigators had over a year to review all information despite having bank statements that dispute what has been claimed as fact to the Court. "All ignored it" which is

what makes it an act of fraud. On August 10, 2014 Defendant sent an email to his Counsel stating there is $40-50 Million Dollars of loans missing from the $29 Million number. See, Exhibit 7.

Kristine Galemmo had faced continuing damaging attacks from clients with the support of Plaintiff's attorneys so as to harm Defendant's family as a legitimate goal and possesses the wherewithal to inflict it. Defendant played a dated voicemail to his attorney, Mr. Dusing, from Mike Murray promising to "Screw up my family". Mr. Murray was the CEO of a $5 Billion Dollar corporation who would boast to Defendant and many others that he could ruin $100 Million Dollar companies who he deemed to be uncooperative. The scheme and actions by all leads Mr. Murray to be a source for the media reports that falsely claim Kristine Galemmo was involved in Queen City's business (labeling her "Kris the Closer"). Plaintiff's attorneys along with 20-30 clients, knowing first hand they had zero information to back up the claims went ahead and filed a civil suit by any means to harm Kristine Galemmo. See, Exhibit ( 8 ), which shows some of the client attacks.

Agent Shorten claims in writing and states that not one individual interviewed said Kristine Galemmo had anything to do with Queen City II's Private Placement. If this is the case then how is it acceptable to target her by Plaintiff's attorney, when obviously the clients had first hand knowledge she had nothing to do with the business, and the Government states this fact. During Defendant's first meeting with 6-8 of the Plaintiff's attorneys, Counsel requested for the attacks to stop and Plaintiff's attorneys agreed they would stop with the false claims and harassment. Then comes the Plaintiff's claims of fraudulent transfers along with emails by clients to Kristine Galemmo's two employers attempting to get her fired. This action has led Kris Galemmo only being able to obtain a $29,000 per annum teaching job. Plaintiff's attorneys and clients fraudulent statements to the media and false claims in 2 civil suites have led to potential employers telling her point blank due to the newspaper articles and civil suites they could not hire her. All have achieved their goals from the start, destroying a person who has not done anything wrong. See, The ruling in the first civil case conveys this fact.

Kris Galemmo was told by her Counsel that Government was not interested in Rugged Power. Why would she think that anything was wrong with the transfer of

RPI shares and she was told it was not a problem. Government then allowed Defendant's legal counsel to get paid from the distribution of Rugged Power 4-6 weeks after she was told point blank it was fine to do the transfer of ownership. Governments actions confirmed what K. Galemmo was told. Hoping now the Court and Plaintiff's attorneys understand the actual events that took place.

Defendant voluntarily told all present about Rugged Power at his proffer session in the Fall of 2013. When Agent Shorten raided the office on June 17, 2013, the other two owners of Rugged Power were present working in the office and were both interviewed by the Agents. Defendant can only speculate as to the fact that they never were asked why they were there. Government than came back and claimed in writing they became aware of Rugged Power in 2014 (an impossibility), once they realized how profitable Queen City Power was, and the fact that Rugged Power exceeded the profitability of Queen City Power, ignoring the fact that 90% of profits occurred after the fund was closed did not matter.

It was time to sieze Rugged Power from only one owner of Rugged Power, K. Galemmo. Government and Plaintiff's attorneys had worked a side deal with Counsel, Jim Burk. They agreed to put $300,000.00 into the victims clawback fund, thus allowing $6,500,000.00 to $7,500,000.00 for the other two owners to keep. Mr. Burk then proceeded to tell K. Galemmo's parents to say nothing positive about Defendant. More importantly is the fact that the other two owners have been allowed to use profits to pay their attorney (Mr. Burk), but the third owner, K. Galemmo was told no!! This was just part of the deal and the court needs to know what else is involved in that deal with the Plaintiff's attorney and Government. Willfull actions leading to targeting against Kris Galemmo is evident by all. Government and Plaintiff's attorney have prevented K. Galemmo from having the same rights the other two owners were given. The law says this cannot happen and therefore why did it and Defendant would state this is still happening today against K. Galemmo.

Defendant must point out some of the misrepresentation of facts and false claims in Case No. 1:13-cv-00883, Doc # 226 filed on 6/04/2015 and focusing on pages 1-14.

1. Claim of $87 Million cumulatively coming into the Private Placement. Their own submitted documents to the Court claims only $61,089,239.96 at Defendants deposition hearing. Even more alarming they make the claim of $50 Million was invested on page 2, Doc # 226, filed on 06/04/2015. The question to be asked, are the Plaintiff's attorneys admitting the $87 Million number is incorrect by $26 Million or $37 Million Dollars. Defendant in Case No. 1:14-cv-00738-MRB provided factual evidence that the $87 Million number is incorrect. The act of making two different claims of the same item (money that had come into the Private Placement), shows the Plaintiff's attorneys willfull duplicity on the Court, K. Galemmo and Defendant.

2. Claim of $29 Million in short-term loans were transactions. Again the Plaintiff's attorneys loan number is $32 Million. Defendant shows how incorrect the Government/Plaintiff's attorneys claim is, by providing actual numbers, that show in excess of $65,000,000.00 loans being done. (See, Case No. 1:14-cv-00738-MRB). Plaintiff's attorneys and clients successfully left out over $10 Million of withdrawals to cover up very profitable transactions by shifting monies and ignoring loans, taking loans and making claims those monies were invested in the Private Placement, demonstrate why the $87 Million number is incorrect, and why Plaintiff's attorneys are off by $26 Million and clients were off by $37 Million Dollars.

3. Claim "The vast majority of the funds were never invested in anything". A "False Statement" and Defendant would claim more money was traded than ever came in the Private Placement. Nobody has ever received the total dollar amount Traded/Invested in the market. The information is out there to be had, but it would take somebody to do what is just. Defendant is currently making efforts to obtain this information and would also state the total dollar amount would be shocking to the Court.

4. Claim "Fraudulent Ponzi Scheme that Galemmo has admitted to operating for over ten years". This is another "False Statement" as the factual numbers show $23,478,291.90 more going out to clients than the Plaintiff's attorneys claim came in. Defendant is therefore not sure what fraudulent Ponzi Scheme would result in more monies going out than coming in? Defendant has also demonstrated with actual numbers that more monies went out than the $116 Million number the Government claims as a total.

5. Claims "On July 23, 2013 after the second FBI raid" shows the lack of knowledge of actual events, but continue to make false claims they cannot prove. "Never happened".

6. The Plaintiff's attorneys submitted K. Galemmo "Deposits to a Joint Account at Key Bank." They go back to 2006 and show the ability to find every last entry, even the two checks for $1,000.00, thus demonstrating to the Court, if wanted, they could provide the same of all their clients. Why is it they can leave out client withdrawals from 2006, 2005, 2004, 2003, 2002, 2001, 2000, and 1999 for all net losers and net winners. This is because the clients true numbers would provide a far different outcome for Defendant and the outrageous attacks on K. Galemmo would not be occurring.

7. Continuing to attack K. Galemmo by making the simple activity of classing her Key Bank accounts appear and look as is she did something wrong. To be clear the Key Bank money going to First Citizen is the same money and is an unbelievable attempt to use the same money over and over again and trying to make it appear to be much greater and never advising the Court these monies were seized by the Government but claim "The funds went straight to K. Galemmo's personal Bank account to be cashed by and used by her entirely for herself". To be clear, K. Galemmo did not use the monies, they were seized.

8. Direct payments to K. Galemmo and individual payments for her benefit totalled $2.5 Million all of which are class funds. Defendant is confused as this number was proclaimed against him at his sentencing hearing. The same money is being claimed twice, against two different individuals. Plaintiff's attorneys show K. Galemmo total at $286,000.00 going back to 2006. Defendant was told by his CPA to pay K. Galemmo in order to keep his taxes down. The sum of $140,000.00 deposited in K. Galemmo's name in the Joint Account, 90% of it was deposited by other individuals than K. Galemmo, and Plaintiff's claim $130,000.00 coming from QC Power. QC Power made $4,000,000.00 in 6 months, before the fund closed. Despite more false claims by the Government and Plaintiff's attorneys, Defendant was due zero monies, as the Private Placement documents clearly states, Defendant gets paid on gains on any single investment. Defendant was due $1,300,000.00, using $90,000.00 to invest in Rugged Power.. The Court has claimed $2,300,000.00 of the Rugged Power monies from K. Galemmo. She as not given the same deal the other two owners of Rugged

Power were given. $300,000.00 from the other two owners gets put into the clawback fund and they get to keep$6,500,00.00 to $7,500,000.00. K. Galemmo has $2,300,000.00 taken from her together with the seized First Citizen $114,029.94, the $36,054.20 for a total of $2,450,084.14. Plaintiff's then claim she has stolen and owes them money. It is very important to realize the facts about the $2,500,000.00 that the Plaintiff's attorneys do not want the Court to know about:

| | |
|---|---|
| <u>$2,500,000.00</u> | Derived from monies going to the Joint Bank account, purchase of automobiles, condo, American Express. |
| - $1,300,000.00 | Due Defendant from profits of QC Power. This is by no means the only money due Defendant, there were other profitable events. |
| - $154,000.00 | From fraudulent charges on the American Express even by one individual who the Government will not go after (Expecting that another deal has been made). These charges are not K. Galemmo's, or the Defendant's. |
| - $625,000.00 | Business expenses/Monies spent directly on clients. American Express 2006-2013. |
| - $250,000.00 | Money paid back to an individual from the sale of the condo, but the whole $532,000.00 purchase price is counted against K. Galemmo and Defendant in the $2,500,000.00 number. |
| - $100,000.00 | Monies K. Galemmo contributed to the Joint Account which the Government/Plaintiff's attorneys chose to ignore. Two years teaching / two other years as a teachers aid, plus numerous other jobs from 2006-2013. |
| $2,429,000.00 | Should be removed from the $2,500,000.00. |
| $71,000.00 | Should have been paid back to client? |
| $2,414,029.94 | Factual amount has been taken from K. Galemmo. |
| $2,343,029.94 | Too much has been taken .......... |

The information provided to the Court regarding the $2.5 Million claim clearly puts this number in great doubt. despite the claim number being off by Millions, the victims/Plaintiff's attorneys have already received more than the value of $2.5 Million through forfeiture proceedings, thus allowing a double recovery of funds by clients/Plaintiff's attorneys. The attempt to claim another $1.5 Million against K. Galemmo has no merit. The question is how many times can the same claim be paid back, once according to the law, not 3 or 4 times. See, Exh. 9.

Defendant has only brought attention to a few events for the Court, however there are many more. The underlying cause of all of these events have occurred due to the fact; that Government testifies to a loan number they are fully aware and have full knowledge is incorrect; willfully do not carry out a loss calculation; convince a prosecutor of information that is incorrect (J. Crew for example); zero neutral review; the Court threatens defendant; the most professional and financially able claimants were encouraged to omit withdrawals that occurred earlier in time than the commencement of the government analyses from their accounting; zero deposits were left our (Started in 1999); characterized loans as investments or investments in unrelated ventures as Queen City private placements; misrepresentations of facts; unchecked personal and financial claim against Defendant, and K. Galemmo; Defendant has demonstrated to the Court, by using the Brady material provided by the government, willful manipulation by all concerned. Bank statements cannot misrepresent the facts and Defendants information comes from the actual documents that exist.

All those who have proclaimed fiduciary responsibility to the Court, must be held responsible for complete failure of their actions. Defendant is fully aware monies have been distributed, and if the same methodology used to enhance the Defendant has been used to distribute monies to individuals, the Court has been misled by all. While working daily to gather information for Defendant's current 2255 motion, Defendant continues to find unexplainable information, this forcing Defendant to make a decision shortly as if he is to or not to provide the needed information to <u>all of those who have been victimized.</u>

Defendant's complete lack of knowledge of the deals offered and the naïve belief that facts at some point were going to come out in all cases, leads Defendant to state on June 17, 2015 Honorable Judge Barrett, "his willingness to help recover monies for clients." As a result of the actions against Defendant's wife has forced him to look at all legal actions needed to provide the Court with positive confirmation of the facts as provided in case No's 1:13-cv-0083 and 1:14-cv-00738 - MRB.

Summary Sheet — From Plaintiff's Attorneys

| Deposited Funds | | Withdrawals |
|---|---|---|
| Initial Deposits | 34,392,427.55 | |
| 2007 | 1,565,546.00 | 1,700,293.00 |
| 2008 | 339,165.00 | 1,178,783.00 |
| 2009 | 422,685.00 | 2,719,281.00 |
| 2010 | 4,432,570.00 | 1,156,139.00 |
| 2011 | 6,228,142,41 | 7,762,561.00 |
| 2012 | 9,440,130.00 | 12,880,099.00 |
| 2013 | 4,268,874.00 | 6,870,210.78 |
| TOTALS | 61,089,239.96 | 34,267,366.78 |

- 34,267,366.78 (Total Withdrawals)

26,821,877.96  The Court must take into account the facts provided by Defendant

## Missing Withdrawals, Deposits, Expenses, Etc.

- 10,400,000.00  Withdrawals left out from the Plaintiffs spread sheets by only 6 individuals — Missing millions more.

- 2,000,000.00  Cash left on Deposits/Bank Accounts (Clients monies) — Have never been taken into consideration by anybody and Never Subtracted.

- 4,834,415.23  Business Expense over 7½ years (Same number as previously provided), and never taken into consideration when calculating a loss.

- 6,828,392.20  Investment Loss, same number as previously provided and never taken into consideration.

= + 1,240,929.47  A net surplus based on the $26,821,877.96 claim as above.

      ???       Missing withdrawals from 1999 – 2006.

The above shows the Court where the above total of $28,062,807.43 were allocated and Plaintiff's attorneys act as if these events never existed or in fact took place. Based on the above, Defendant makes the claim that $15,000,000.00 of withdrawals by Plaintiff's have been purposely left out, together with $2,000,000.00 left in bank accounts, the amount of $2,450,084.14 taken from Kris Galemmo, the $6,828,392.20 actual investment loss (low end), and $4,834,415.23 in Business expenses, arriving at an amount of $31,112,891.57 that Plaintiff's attorneys claim never happened. Defendant requests the Court to take action against all of those who have made a claim of fiduciary responsibility to the Court, thus purposely and willfully misleading the Court in the Case No. 1:13-cv-00883 and victimizing their own clients by these actions.

C. Argument:

Petitioner's claim of fraudulent transfers comes form nothing but a misrepresentation of information to the Court, Petitioner has provided factual evidence and events to the scheme and complete willful duplicity of accurate numbers of their clients. Making statements to the media that are designed to arouse public indignation, laughing about their own actions, while destroying an innocent individual's character and taking away K. Galemmo's ability to support her family.

Withholding exculpatory evidence by the Petitioner's attorney and the Government, along with the skill of purposely making claims to a wrong loan number to the Court. Thus to create a false outcome that leads to the cover up of million of dollars the clients received, false attacks on K. Galemmo, and Petitioner being wrongly enhanced, it all starts by allowing a probation officer turn CPA to come up with a restitution number that Petitioner's attorney's clients knew to be wrong. That lead to those claiming fiduciary responsibility to leave out 7 years of withdrawals, at least $10,400,000.00 of additional withdrawals.

The Court should instruct the Government's attorneys to provide a spread sheet showing all withdrawals from the date they started investing in the private placement. They have demonstrated to the Court their ability to do this in the case against K. Galemmo but not with the clients they represent. Those actions from the start have created a false outcome.

A prosecutor doing the job right requires a strong sense of honor, integrity, objectivity and fairness. A Federal Prosecutor has immense, unbridled power along with a broad spectrum of discretion. When the Prosecutor is led to believe that only $29 Million dollars of loans were done, only a handful of individuals did loans, not realizing individuals have been allowed by a probation officer to make claims on non-related investments, claims going unchecked, never being told 8-12 individuals received compensation and raised over $20 Million dollars (with the loan monies the number balloons to well over $40 Million), and Petitioner has reason to believe other very important events and facts by individuals have never made it to the Prosecutor. All these factors leads to a misrepresentation of the facts and to a very incorrect restitution number. Petitioner believes based on the Government's attorneys experience had full

knowledge of the endless problems with the restitution number. Most importantly a restitution is not a loss calculation. If the Government is not honest in testimony, it can trump even the best efforts of those who work in the system that also leads to a Prosecutor making the claim to Court that Petitioner and K. Galemmo charged 90-100K in charges from J. Crew on the American Express. A complete fraudulent statement.

With this Court's review of the instant Motion thus far, Petitioner will be able to prove the Court's satisfaction that the client/victim testimony at his sentencing hearing was perjured based upon fraudulent loss statements by covering up and omitting profitable loan transactions to influence the sentencing determination if favor of both more time served and undeserved restitution rewards as a means of appeasing the Government from investigating the client/victim financial positions any further to expose their own fraud upon the Court.

As Petitioner has already filed his section 2255 Petition, Petitioner's request for production of a hard copy sentencing transcript is not a traditional "Fishing Expedition", but merely a means to elicit actual transcript quotes of the client/victims to verify his allegations for the Court.

As Circuit precedent reveals upon collateral attack "There is no Constitutional Right to Trial Transcripts." United States v. Sain, 387 F. Appx. 558, 560 (6th Cir. 2010). However instant case when Petitioner's researcher attempted to download his trial transcripts from PACER, U.S. Court Index, the Sentencing Transcript was blocked and inaccessible.

As this Circuit adopted in Speer v. United States, 2013 U.S. Dist. LEXIS 1098608, "Habeas Corpus Petitioner is not entitled to discovery as a right. Bracy v. Gramley, 520 U.S. 899 (1997), as quoted in Stanford v. Parker, 266 F. 3d 442 (6th Cir. 2001).

Under the provisions of Rule 6(a) Rules governing section 2254[2255] proceedings in the United States District Court, A Petitioner "Shall be entitled to invoke the process of discovery available under the Federal Rules of Civil Procedure if and to the extent that the Judge in the exercise of his/her discretion and for good cause grants leave to do so, but not otherwise".

Discovery is warranted only where "Specific allegations before the Court show reason to believe that the Petitioner may, of the facts are fully developed, be able to demonstrate that he is ... entitled to relief". Harris v. Nelson, 394 U.S. 286 (1969), quoted in Bracy v. Gramley, 117 S. Ct. at 1799; Williams v. Bagley, 380 F 3d 932, 974 (6th Cir. 2004).

When a Petitioner fails to make "a fact Specific showing Good Cause under Rule 6", the Court will deny the discovery requests as a "mere fishing expedition" Stanford v. Parker (as cited above); Williams v. Bagley (as cited above) Rule 7, Rules governing Section 2254 [2255] cases, further limits discovery, allowing only the "addition of records which are relevant to the merits of a habeas corpus petition."

In the instant case Petitioner has met the Standards of presenting a prima facia case of a violation of a Constitutional nature during his sentencing hearing through Fraudulent victim/client assertions on loss amounts that were not truthful or accurate driving the sentencing exposure up 4 levels. Moreover, the client/victim withdrawals from their bank accounts are off by 15 to 16 Million as the client/victims claim that $93 Million came in, but the Government claims $116 Million came in. The Court may find that this example is a moot point as Petitioner has proven herein and will verify more has gone out to the client/victims that either hey or their Counsel claim.

These factors would all lean in Petitioner's favor for this Court to produce a Hard Copy of the Sentencing transcript in the instant case.

D. Conclusion:

In the interests of Justice and Judicial economy Petitioner would respectfully request this Court to Grant his request for production of a Hard Copy of his sentencing transcript in it's entirety.

Respectfully Submitted by,

Date: 7/12/2016
Executed under the Pains
and Penalties of Perjury
Pursuant to 28 USC §1746

Glen Galemmo, Pro Se
Fed. Reg. No. 72083-061
LSCI Butner – Durham B
P.O. Box 999
Butner, NC 27509

## Certificate of Service

This is to certify that Petitioner has placed into the Institutional prison mailing system a copy of the enclosed filing via First Class U.S. Postal mailing for delivery to the U.S Post Office of LSCI Butner's choosing. Petitioner requests the Court and the parties to be mindful of the facts that LSCI Butner is a part of the 5 Institutional Federal Medical Complex located at Butner, North Carolina and as such utilizes a single Federal Medical Complex mail room for sorting of incoming and outgoing U.S. Postal mail. As such LSCI Butner prisoner mail goes through the Butner Medical Complex mailing facility to the U.S. Post Office at the time and location of FBOP Butner's choosing for timely filing. With these operating factors in mind this filing is timely filed pursuant to Houston v. Lack, 487 U.S. 266 (1988) and the "Prison Mail Box Rule" delineated therein!

Respectfully Submitted by,

Date: 7/12/2016
Executed under the Pains
and Penalties of Perjury
Pursuant to 28 USC §1746

Glen Galemmo, Pro Se
Fed. Reg. No. 72083-061
LSCI Butner - Durham B
P.O. Box 999
Butner, NC 27509

cc: U.S. Attorneys Office
    Cincinnati, Ohio
    Attn: Emily Glatfeler, AUSA
          Timothy Magan, AUSA



UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

DIVISION OF
ENFORCEMENT

May 2, 2016

Sean McKessy, Chief
Office of the Whistleblower
Fax: (703) 813-9322
Phone: (202) 551-4790

Glen Galemmo
P.O. Box 999
Butner, NC 27509

TCR Submission number: TCR1460560238218
Submission dated: April 4, 2016

Dear Mr. Galemmo:

Thank you for the information that you submitted under the SEC's Whistleblower Program. We greatly appreciate your bringing this matter to our attention. The success of the whistleblower program depends on individuals providing the Commission with specific, timely, and credible information.

Members of the staff of the Division of Enforcement may contact you for additional assistance or information. In addition, we encourage you to submit any additional supporting information or materials that you believe will assist us in analyzing and fully understanding this matter.

On August 12, 2011 the final Whistleblower rules went into effect. It is now required that you submit a signed Form-TCR (including the declarations page) in order to be considered for a whistleblower award. You are encouraged to submit the form using our online questionnaire, which you can access at www.sec.gov/whistleblower. That website also has a link to a pdf of the Form-TCR that you may also complete and sign and send to us via hard copy at Office of the Whistleblower, 100 F Street, NE, Mail Stop 5971, Washington, DC 20549 or fax it to (703) 813-9322.

Thank you again for taking the opportunity to submit your information to us. Efforts by persons such as yourself are critical to the success of this program.

Please do not hesitate to contact the Office of the Whistleblower if you have any questions or concerns.

Best regards,

Sean McKessy

COMMISSION STATEMENT REGARDING DECISION IN *KOCH V. SEC*

In its July 14, 2015 decision in *Koch et al. v. SEC* (No. 14-1134), the United States Court of Appeals for the D.C. Circuit granted in part a petition for review of a Commission order imposing sanctions for violations of the securities laws. The court held in relevant part that the portion of the order imposing bars from association with municipal advisors and nationally recognized statistical rating organizations was impermissibly retroactive, and the court therefore vacated those bars. Congress first authorized the Commission to impose those associational bars in the Dodd-Frank Act, which was enacted on July 21, 2010. In *Koch*, all the conduct at issue pre-dated the enactment of the Dodd-Frank Act, and the court held that applying those provisions to such conduct would be impermissibly retroactive. The Commission has determined not to seek further review of that decision.

If you are the subject of a Commission order imposing a bar from associating with a municipal advisor and/or a nationally recognized statistical rating organization *and* you believe that the *Koch* decision affects the bar(s) in your case because all of the conduct relevant to such bar(s) occurred before July 22, 2010, the effective date of the Dodd-Frank Act, you may request that the Commission issue an order vacating the bar(s) by completing the form available at this link: www.sec.gov/about/offices/ocr/form-nrsro-muni-bars.pdf and submitting the form to the Commission as the form directs. This process applies only to these two bars; if the Commission grants you relief, any other bars or suspension from association that were imposed (such as bars from associating with a broker-dealer or investment adviser) will remain in force.

This statement does not constitute a decision by the Commission on any particular case or request.

# REQUEST TO VACATE BAR(S) FROM ASSOCIATION WITH NATIONALLY RECOGNIZED STATISTICAL RATING ORGANIZATIONS AND/OR MUNICIPAL ADVISORS IN LIGHT OF *KOCH V. SEC*

**Summary:**

1. As a result of the decision of the United States Court of Appeals for the District of Columbia Circuit in *Koch v. SEC*, the Securities and Exchange Commission has determined to grant requests to vacate bars from association with nationally recognized statistical rating organizations ("NRSROs") and municipal advisors that were imposed against individuals based entirely on conduct that occurred before the effective date of the Dodd-Frank Wall Street Reform and Consumer Protection Act (July 22, 2010).

2. The Commission has established an expedited program for eligible individuals to request that their NRSRO and/or municipal advisor bars be vacated through the completion of this form.

3. This program applies only to NRSRO and municipal advisor bars. If we determine that you are eligible for relief under the program, all other bars and/or suspensions to which you are subject (e.g., from association with a broker-dealer or investment adviser) would remain in place.

**Instructions:**

1. To make a request that the Commission vacate your NRSRO and municipal advisor bars, you must complete this form by providing all information sought below. Completing the form will facilitate the Commission's determination of your eligibility for the program. Do not submit any additional materials with this form. If the Commission determines that it needs additional information to determine your request, it will notify you.

2. Send three copies of your completed form to the following address:
   Office of the Secretary
   U.S. Securities and Exchange Commission
   100 F Street, N.E.
   Washington, D.C. 20549-1090

3. You will be notified of the Commission's determination of your request at the address you provide below.

**Information to be provided by affected individual:**

Name: Glen Galemmo, Counsel of Record, Pro Se.

Address: LSCI Butner, P.O. Box 999, Butner, NC 27509

I am subject to a bar from association with any nationally recognized statistical rating organization and/or municipal advisor based solely on conduct that occurred before July 22, 2010.
☒ Yes ☐ No

Date of order imposing bar: Judgement and Commitment Order of September 2, 2014

Signature: _____          Dated: April 4, 2016

Exhibit A

## BRIEFS

### U.S. attorney for Greater Cincinnati area resigns

The U.S. attorney for the district that covers the Greater Cincinnati area is resigning.

Carter M. Stewart, 46, announced his resignation Friday effective March 11. After his resignation, he plans on joining a Columbus-area nonprofit. He has been in the office since 2009.

"Not just serving as U.S. Attorney in the Southern District of Ohio, but serving under this president and Attorneys General Holder and Lynch, has been the highest honor of my professional career," Stewart, of Gahanna, Ohio, said in an emailed statement. Some high-profile Cincinnati area cases prosecuted under Stewart include:

» The current prosecution of Christopher Lee Cornell, 21, of Green Township charged with attempting to provide material support to the Islamic State and other related offenses. He allegedly plotted, planned and attempted to attack the U.S. Capitol and kill government officials.

» Cincinnati money manager Glen Galemmo sentenced to 188 months in prison in 2014 for operating a Ponzi scheme that defrauded investors of more than $87 million. Galemmo used the money as his personal bank, paying country club fees, taking luxurious vacations and buying real estate, clothing and jewelry.

» Robert Frank Poandl, a priest, was sentenced to 90 months in prison for illicit interstate transportation of a minor. A jury convicted Poandl on September 20, 2013. Testimony presented during the trial showed that, in August 1991, Poandl transported a 10-year-old boy from Cincinnati to West Virginia where he sexually assaulted the child. The crime was not disclosed until the victim came forward in 2009.

COLUMBUS, Ohio  United States Attorney Carter M. Stewart, 46, of Gahanna, Ohio, has announced his resignation effective midnight on March 11, 2016. After his resignation, he plans on joining a non-profit/foundation in the Columbus area.

"Not just serving as U.S. Attorney in the Southern District of Ohio, but serving under this president and these Attorneys General Holder and Lynch, has been the highest honor of my professional career," U.S. Attorney Stewart said. "I could not be prouder to call myself a member of this U.S. Attorney s Office. There are no more dedicated public servants than the men and women in this office who push themselves every day to pursue our core mission: protecting and serving the citizens of the Southern District of Ohio through the ethical, vigorous, impartial enforcement of the laws of the United States."

Entering office in 2009 during the height of the national financial crises and the collapse of the housing market, U.S. Attorney Stewart established White Collar crime with a focus on mortgage fraud as a top priority for the district, in addition to National Security and Violent Crime. More recently, as the opioid epidemic has grown, he has increased resources for prosecuting pill mills, preventing opioid/heroin abuse and treating addiction.

Emphasizing prevention, Stewart created a robust outreach program in the District, establishing the position of Outreach Coordinator to better understand community needs. He made efforts to be a consistent and accessible resource for the community and also encouraged greater involvement in reentry efforts. Stewart prioritized building trust between community and law enforcement.

"Since 2009, U.S. Attorney Carter Stewart has served the people of the Southern District of Ohio  and all Americans  with fidelity and distinction," said Attorney General Loretta Lynch. "Throughout his tenure, he has brought his collaborative approach to a wide range of issues, convening important summits on civil rights, cybercrime, juvenile justice, and opioid abuse. He helped to strengthen our global partnerships by representing the U.S. Attorneys community abroad. And as a member of the Attorney General s Advisory Committee, he spearheaded vital efforts to promote racial equality and to protect children throughout the United States. In these and in many other undertakings, Carter distinguished himself through his hard work, his dedication, and his integrity. I want to thank him for his outstanding contributions, and I wish him the best as he continues his public service career in the nonprofit sector."

Stewart brought together a diverse group of stakeholders through the creation of the Columbus Community Engagement Council, which included community leaders who represent the city s diversity in terms of ethnicity, race, faith and sexual orientation.

Under his leadership, the office convened education professionals, medical personnel, faith leaders, advocates and the business community to raise awareness about various issues including civil rights for new Americans, cybersecurity, child exploitation, human trafficking, the school-to-prison pipeline and violent extremism.

Exhibit C

Stewart, a graduate of Stanford University, Columbia University and Harvard Law School, previously worked as an Assistant U.S. Attorney in San Jose, Calif., where he prosecuted a variety of cases including drug and gun crimes, environmental crimes, and the illegal distribution of steroids to professional athletes. During his tenure as U.S. Attorney, he served on the Attorney General s Advisory Committee and chaired the Attorney General s Child Exploitation Working Group and the Racial Disparities Working Group.

Among the cases prosecuted under Stewart:

U.S. v. William M. and Connie M. Apostelos is a pending case which charges the couple, who oversaw multiple companies in the Dayton, Ohio area, with orchestrating an alleged $70 million Ponzi scheme.

U.S. v. Keith A. Arrick, Sr. and Keith A. Arrick, Jr. is a case in which a father and son have both been sentenced for running a sex trafficking operation. Arrick Sr. was sentenced to 13 years in prison and Arrick Jr. was sentenced to 10 years in prison.

U.S. v. Mark M. Beatty is the first criminal enforcement of the Native American Graves Protection and Repatriation Act in the Southern District of Ohio. It involves a Jackson County man who has pleaded guilty to illegally purchasing Native American human remains. Beatty has not been sentenced yet.

U.S. v. Columbus Steel Castings Company, Inc. resulted in the company paying $825,000 for violating the Clean Air Act. Part of that money funded a Conservation Classroom Program in ten schools in South Columbus within the Columbus Public Schools.

U.S. v. Christopher Lee Cornell involves a 21-year-old Cincinnati-area man charged with attempting to provide material support to ISIL and other related offenses. He allegedly plotted, planned and attempted to attack the U.S. Capitol and kill government officials.

U.S. v. Shane K. Floyd et al. resulted in a jury trial at which school officials charged with a bribe and kickback scheme were found guilty of a $500,000 public corruption scheme. Four defendants were sentenced for their roles in connection with the crimes at the Arise Academy in Dayton, Ohio. School officials solicited and accepted bribes in exchange for a lucrative, unbid consulting contract.

U.S. v. Glen Galemmo involves an investment company owner who was sentenced to 188 months in prison for operating a Ponzi scheme that defrauded investors of more than $87 million. Galemmo used the money as his personal bank, paying country club fees, taking luxurious vacations and buying real estate, clothing and jewelry.

United States ex rel. Fry v. Health Alliance of Greater Cincinnati, Inc (HAGC). In 2010, HAGC and The Christ Hospital paid $110 million for violating the anti-kickback statute and False Claims Act by paying physicians for referring cardiac patients to The Christ Hospital.

U.S. v. Robert Ledbetter et al. (Short North Posse) is the largest federal murder indictment in Ohio s history. The racketeering case involves 20 defendants and 13 previously unsolved murders. A trial is set for April 2016.

U.S. v. Charles M. McBeath and Antonio J. Spiva includes charges against two Dayton, Ohio men for distributing heroin and fentanyl that resulted in overdose deaths. Distribution resulting in death is a crime that is punishable by a mandatory minimum of 20 years up to lifetime imprisonment.

U.S. v. Abdirahman Mohamud involves a 23-year-old Columbus, Ohio resident and naturalized citizen who is charged with providing material support to terrorists (al-Nusrah). He allegedly traveled to Syria to obtain terrorist training and was instructed to return to the United States and commit an act of terrorism.

U.S. v. James O. Napier involves a Cincinnati man that was sentenced to serve 240 years in prison for producing child pornography involving an 11-month old infant and an approximately nine-year-old child.

U.S. v. Robert Frank Poandl involves a priest that was sentenced to 90 months in prison for illicit interstate transportation of a minor. A jury convicted Poandl on September 20, 2013. Testimony presented during the trial showed that, in August 1991, Poandl transported a 10-year- old boy from Cincinnati to West Virginia where he sexually assaulted the child. The crime was

Exhibit C

| DAYS | NAME | AMOUNT | % | %DUE | $ DUE | DUE DATE | DATE |
|---|---|---|---|---|---|---|---|
| 19 | Allen Sheff | $ 40,000.00 | 7.0% | $ 2,800.00 | $ 42,800.00 | 8/6/2010 | 7/19/2010 |
| 12 | Allison Bristol | $ 80,000.00 | 6.5% | $ 5,200.00 | 85,200.00 | 11/18/2009 | 11/7/2009 |
| 19 | Andrew Riffe | $ 5,300.00 | 7.5% | $ 397.50 | 5,697.50 | 3/17/2010 | 2/27/2010 |
| 30 | Bill Cox | $ 100,000.00 | 7.5% | $ 7,500.00 | 107,500.00 | 12/23/2011 | 11/23/2011 |
| 8 | Bill Cox | $ 225,000.00 | 6.0% | $ 13,500.00 | 238,500.00 | 12/6/2012 | 11/29/2011 |
| 10 | Bill Cox | $ 100,000.00 | 6.6% | $ 6,550.00 | 106,550.00 | 2/23/2012 | 2/14/2012 |
| 9 | Bill Cox | $ 300,000.00 | 7.0% | $ 21,000.00 | 321,000.00 | 7/23/2012 | 7/15/2012 |
| 12 | Bill Cox | $ 300,000.00 | 8.0% | $ 24,000.00 | 324,000.00 | 7/24/2012 | 7/13/2012 |
| 14 | Bill Cox | $ 300,000.00 | 9.0% | $ 27,000.00 | 327,000.00 | 7/31/2012 | 7/18/2012 |
| 19 | Bill Cox | $ 150,000.00 | 8.0% | $ 12,000.00 | 162,000.00 | 6/5/2012 | 5/18/2012 |
| 21 | Bill Cox | $ 150,000.00 | 9.0% | $ 13,500.00 | 163,500.00 | 6/6/2012 | 5/17/2012 |
| 14 | Bill Cox | $ 200,000.00 | 8.0% | $ 16,000.00 | 216,000.00 | 10/1/2012 | 9/18/2012 |
| 15 | Bill Cox | $ 100,000.00 | 7.5% | $ 7,500.00 | 107,500.00 | 9/30/2010 | 9/16/2010 |
| 9 | Bill Cox | $ 77,000.00 | 9.0% | $ 6,906.90 | 83,906.90 | 3/9/2010 | 3/1/2010 |
| | | $ 2,002,000.00 | | $ 155,456.90 | 2,157,456.90 | | |
| 30 | Bill Lawarre | $ 300,000.00 | 8.0% | $ 24,000.00 | 324,000.00 | 6/20/2011 | 5/22/2011 |
| 16 | Bill Lawarre | $ 100,000.00 | 7.3% | $ 7,250.00 | 107,250.00 | 2/9/2012 | 1/25/2012 |
| 14 | Bill Lawarre | $ 100,000.00 | 7.0% | $ 7,000.00 | 107,000.00 | 1/9/2012 | 12/27/2011 |
| 24 | Bill Lawarre | $ 200,000.00 | 7.5% | $ 15,000.00 | 215,000.00 | 7/6/2012 | 6/13/2012 |
| 28 | Bill Lawarre | $ 200,000.00 | 7.7% | $ 15,300.00 | 215,300.00 | 12/13/2010 | 11/16/2010 |
| 30 | Bill Lawarre | $ 300,000.00 | 8.0% | $ 24,000.00 | 324,000.00 | 6/20/2011 | 5/22/2011 |
| 22 | Bill Lawarre | $ 200,000.00 | 7.3% | $ 14,500.00 | 214,500.00 | 3/1/2011 | 2/8/2011 |
| 14 | Bill Scoville | $ 45,000.00 | 7.5% | $ 3,375.00 | 48,375.00 | 11/20/2009 | 11/7/2009 |
| | | $ 1,445,000.00 | | $ 272,788.80 | 3,796,788.80 | | |
| 11 | Bob Maxwell | $ 100,000.00 | 8.0% | $ 8,000.00 | 108,000.00 | 5/14/2012 | 5/1/2012 |
| 28 | Bob Maxwell | $ 100,000.00 | 10.0% | $ 10,000.00 | 110,000.00 | 10/3/2012 | 9/6/2012 |
| 30 | Bob Maxwell | $ 100,000.00 | 9.0% | $ 9,000.00 | 109,000.00 | 7/12/2012 | 6/12/2012 |
| 30 | Bob Maxwell | $ 100,000.00 | 0.0% | $ 7,250.00 | - | 7/8/2013 | 6/8/2013 |

Confidential - Subject to Protective Order

Exhibit 1

| No. | Name | Principal | Rate | Interest | Total | Date | Date |
|---|---|---|---|---|---|---|---|
| 30 | Jason Sargent | | 0.0% | $ 6,000.00 | - | 7/8/2013 | 6/8/2013 |
| 35 | Jay Howard | $ 100,000.00 | 7.2% | $ 7,200.00 | $ 107,200.00 | 10/19/2011 | 9/15/2011 |
| 28 | Jay Howard | $ 135,000.00 | 7.5% | $ 10,125.00 | $ 145,125.00 | 4/6/2012 | 3/10/2012 |
| 35 | Jay Howard | $ 181,812.60 | 7.5% | $ 13,635.95 | $ 195,448.54 | 8/10/2012 | 7/1/2012 |
| 35 | Jay Howard | $ 169,128.00 | 7.5% | $ 12,684.60 | $ 181,812.60 | 7/6/2012 | 6/2/2012 |
| 35 | Jay Howard | $ 156,600.00 | 8.0% | $ 12,528.00 | $ 169,128.00 | 6/8/2012 | 5/5/2012 |
| 28 | Jay Howard | $ 145,000.00 | 8.0% | $ 11,600.00 | $ 156,600.00 | 5/4/2012 | 4/7/2012 |
| 35 | Jay Howard | $ 195,448.55 | 7.5% | $ 14,658.64 | $ 210,107.19 | 9/14/2012 | 8/11/2012 |
| 28 | JD Store Inc. | $ 150,000.00 | 7.4% | $ 11,100.00 | $ 161,100.00 | 11/14/2011 | 10/18/2011 |
| 18 | JD Store Inc. | $ 150,000.00 | 7.4% | $ 11,100.00 | $ 161,100.00 | 9/26/2011 | 9/9/2011 |
| 25 | Jim Perry | $ 75,000.00 | 7.0% | $ 5,250.00 | $ 80,250.00 | 8/14/2012 | 7/21/2012 |
| 19 | Jim Perry | $ 50,000.00 | 7.3% | $ 3,625.00 | $ 53,625.00 | 2/2/2012 | 1/15/2012 |
| 25 | Jim Perry | $ 75,000.00 | 8.0% | $ 6,000.00 | $ 81,000.00 | 6/1/2012 | 5/8/2012 |
| 16 | Jim Perry | $ 28,000.00 | 9.0% | $ 2,520.00 | $ 30,520.00 | 5/15/2010 | 4/30/2010 |
| 15 | Jim Perry | $ 50,000.00 | 6.3% | $ 3,125.00 | $ 53,125.00 | 4/11/2011 | 3/28/2011 |
| 23 | Jim Perry | $ 40,000.00 | 8.9% | $ 3,560.00 | $ 43,560.00 | 12/9/2010 | 11/17/2010 |
| 22 | Jim Perry | $ 50,000.00 | 7.7% | $ 3,825.00 | $ 53,825.00 | 7/28/2011 | 7/7/2011 |
| 27 | Jim Perry | $ 50,000.00 | 7.5% | $ 3,750.00 | $ 53,750.00 | 11/14/2011 | 10/19/2011 |
| 24 | Jim Perry | $ 50,000.00 | 7.7% | $ 3,825.00 | $ 53,825.00 | 10/1/2010 | 9/8/2010 |
| 22 | Jim Perry | $ 30,000.00 | 7.5% | $ 2,250.00 | $ 32,250.00 | 1/4/2009 | 12/14/2008 |
| 22 | John Long | $ 200,000.00 | 7.3% | $ 14,500.00 | $ 214,500.00 | 3/1/2011 | 2/8/2011 |
| 16 | Joseph Dabdoub | $ 150,000.00 | 8.0% | $ 12,000.00 | $ 162,000.00 | 7/29/2011 | 7/14/2011 |

Confidential - Subject to Protective Order

Exhibit 1

| | | Principal | Rate | Interest | Total | Date | Date |
|---|---|---|---|---|---|---|---|
| 30 | Joseph Dabdoub | $150,000.00 | 12.0% | $18,000.00 | $168,000.00 | 6/20/2011 | 5/20/2011 |
| 35 | Jrouh Al-Akkawi | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 7/6/2013 | 6/2/2013 |
| 35 | Jrouh Al-Akkawi | $100,000.00 | 8.0% | $8,000.00 | $108,000.00 | 5/18/2012 | 4/14/2012 |
| 30 | Jrouh Al-Akkawi | $64,440.00 | 7.4% | $4,768.56 | $69,208.56 | 11/14/2011 | 10/14/2011 |
| 11 | Jrouh Al-Akkawi | $34,972.00 | 8.0% | $2,797.76 | $37,769.76 | 11/16/2011 | 11/1/2011 |
| 18 | Jrouh Al-Akkawi | $60,000.00 | 7.4% | $4,440.00 | $64,440.00 | 9/26/2011 | 9/9/2011 |
| 8 | Jrouh Al-Akkawi | $125,000.00 | 6.0% | $7,500.00 | $132,500.00 | 12/6/2012 | 11/29/2012 |
| 35 | Jrouh Al-Akkawi | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 8/10/2012 | 7/7/2012 |
| 35 | Jrouh Al-Akkawi | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 7/6/2012 | 6/2/2012 |
| 35 | Jrouh Al-Akkawi | $190,000.00 | 7.5% | $14,250.00 | $204,250.00 | 10/29/2012 | 9/25/2012 |
| 35 | Jrouh Al-Akkawi | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 9/24/2012 | 8/21/2012 |
| 22 | Kay Frey | $50,000.00 | 7.5% | $3,750.00 | $53,750.00 | 12/13/2010 | 10/22/2010 |
| 23 | Kay Frey | $20,000.00 | 7.5% | $1,500.00 | $215,000.00 | 11/1/2010 | 10/10/2010 |
| 20 | Kay Frey | $50,000.00 | 8.0% | $4,000.00 | $54,000.00 | 2/3/2011 | 1/15/2011 |
| 18 | Kevin Eickman | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 8/9/2010 | 7/23/2010 |
| 17 | Kevin Eickman | $300,000.00 | 7.5% | $22,350.00 | $322,350.00 | 7/28/2011 | 7/12/2011 |
| 21 | Kirk TenEyke/Marbank Man. | $50,000.00 | 7.0% | $3,500.00 | $53,500.00 | 6/6/20111 | 5/17/2011 |
| 22 | Kirk TenEyke/Marbank Man. | $75,000.00 | 7.1% | $5,325.00 | $80,325.00 | 10/7/2011 | 9/16/2011 |
| 30 | Kirk TenEyke/Marbank Man. | $100,000.00 | 7.0% | $7,000.00 | $107,000.00 | 8/8/2012 | 7/8/2012 |
| 6 | Kirk TenEyke/Marbank Man. | $100,000.00 | 5.0% | $5,000.00 | $105,000.00 | 2/10/2012 | 2/5/2012 |
| 17 | Kirk TenEyke/Marbank Man. | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 3/20/2012 | 3/4/2012 |
| 15 | Kirk TenEyke/Marbank Man. | $80,000.00 | 7.3% | $5,800.00 | $85,800.00 | 5/16/2012 | 5/2/2012 |
| 18 | Kirk TenEyke/Marbank Man. | $75,000.00 | 8.1% | $6,093.75 | $81,093.75 | 1/14/2009 | 12/28/2008 |
| 29 | Leonid Macheret | $50,000.00 | 7.4% | $3,700.00 | $53,700.00 | 11/14/2011 | 10/17/2011 |

Confidential - Subject to Protective Order

Exhibit 1

| # | Name | Principal | Rate | Interest | Total | Date 1 | Date 2 |
|---|---|---|---|---|---|---|---|
| 20 | Leonid Macheret | $50,000.00 | 7.4% | $3,700.00 | $53,700.00 | 9/26/2011 | 9/7/2011 |
| 15 | Leonid Macheret | $50,000.00 | 8.0% | $4,000.00 | $58,000.00 | 8/1/2011 | 7/18/2011 |
| 15 | Leonid Macheret | $150,000.00 | 7.0% | $10,500.00 | $160,500.00 | 4/6/2012 | 3/23/2012 |
| 35 | Leonid Macheret | $200,000.00 | 7.3% | $14,500.00 | $214,500.00 | 8/31/2012 | 7/28/2012 |
| 70 | Leonid Macheret | $100,000.00 | 26.0% | $26,000.00 | $126,000.00 | 12/21/2012 | 10/13/2012 |
| 70 | Leonid Macheret | $230,000.00 | 26.0% | $59,800.00 | $289,800.00 | 12/24/2012 | 10/16/2012 |
| 16 | Leonid Macheret | $100,000.00 | 7.3% | $7,250.00 | $107,250.00 | 2/6/2012 | 1/22/2012 |
| 28 | Leonid Macheret | $230,000.00 | 7.3% | $16,675.00 | $246,675.00 | 7/19/2012 | 6/22/2012 |
| 30 | Leonid Macheret | $30,000.00 | 8.0% | $2,400.00 | $32,400.00 | 6/18/2012 | 5/18/2012 |
| 28 | Leonid Macheret | $50,000.00 | 7.0% | $3,500.00 | $53,500.00 | 5/4/2012 | 4/7/2012 |
| 28 | Leonid Macheret | $200,000.00 | 7.0% | $14,000.00 | $214,000.00 | 5/4/2012 | 4/7/2012 |
| 28 | Leonid Macheret | $150,000.00 | 7.0% | $10,500.00 | $160,500.00 | 5/4/2012 | 4/7/2012 |
| 35 | Leonid Macheret | $230,000.00 | 7.3% | $16,675.00 | $246,675.00 | 10/15/2012 | 9/11/2012 |
| 42 | Leonid Macheret | $50,000.00 | 8.0% | $4,000.00 | $54,000.00 | 11/5/2010 | 9/25/2010 |
| 38 | Leonid Macheret | $25,000.00 | 8.0% | $2,000.00 | $27,000.00 | 2/1/2011 | 12/26/2010 |
| 14 | Leonid Macheret | $25,000.00 | 8.0% | $2,000.00 | $27,000.00 | 1/5/2011 | 12/23/2010 |
| 21 | Leonid Macheret | $25,000.00 | 12.0% | $3,000.00 | $28,000.00 | 11/12/2010 | 10/23/2010 |
| 25 | Michael Stacy | $100,000.00 | 7.3% | $7,300.00 | $107,300.00 | 7/15/2011 | 6/21/2011 |
| 31 | Michael Stacy | $100,000.00 | 9.0% | $9,000.00 | $109,000.00 | 5/12/2011 | 4/13/2011 |
| 36 | Michael Stacy | $100,000.00 | 7.6% | $7,600.00 | $107,600.00 | 11/14/2011 | 10/10/2011 |
| 22 | Michael Stacy | $100,000.00 | 7.4% | $7,375.00 | $107,375.00 | 9/8/2011 | 8/18/2011 |
| 19 | Michael Stacy | $100,000.00 | 7.5% | $7,500.00 | $107,500.00 | 4/10/2012 | 3/23/2012 |
| 16 | Michael Stacy | $100,000.00 | 7.3% | $7,250.00 | $107,250.00 | 2/13/2012 | 1/28/2012 |
| 25 | Michael Stacy | $100,000.00 | 8.0% | $8,000.00 | $108,000.00 | 6/1/2012 | 5/8/2012 |
| 8 | Michael Stacy | $100,000.00 | 4.5% | $4,500.00 | $104,500.00 | 6/15/2012 | 6/8/2012 |
| 14 | Michael Stacy | $100,000.00 | 6.0% | $6,000.00 | $106,000.00 | 10/15/2012 | 10/2/2012 |
| 16 | Michael Stacy | $50,000.00 | 7.1% | $3,550.00 | $53,550.00 | 8/18/2010 | 8/3/2010 |
| 22 | Michael Stacy | $50,000.00 | 7.7% | $3,850.00 | $53,850.00 | 12/18/2010 | 11/27/2010 |
| 22 | Michael Stacy | $50,000.00 | 7.7% | $3,850.00 | $53,850.00 | 12/30/2010 | 12/9/2010 |
| 17 | Michael Stacy | $100,000.00 | 6.0% | $6,000.00 | $106,000.00 | 3/25/2011 | 3/9/2011 |
| 24 | Michael Stacy | $100,000.00 | 7.7% | $7,690.00 | $107,690.00 | 11/12/2010 | 10/20/2010 |
| 24 | Michael Stacy | $100,000.00 | 7.7% | $7,650.00 | $107,650.00 | 10/1/2010 | 9/8/2010 |

Confidential – Subject to Protective Order

Exhibit 1

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 19 | Michael Stacy | $ 50,000.00 | 6.8% | $ 3,375.00 | $ 53,375.00 | 7/8/2010 | 6/20/2010 |
| 30 | Michael Woehler | $ 200,000.00 | 9.0% | $ 18,000.00 | $ 218,000.00 | 12/27/2011 | 11/27/2011 |
| 23 | Michael Woehler | $ 150,000.00 | 6.7% | $ 10,065.00 | $ 160,065.00 | 7/7/2011 | 6/15/2011 |
| 31 | Michael Woehler | $ 150,000.00 | 9.0% | $ 13,500.00 | $ 163,500.00 | 5/9/2011 | 4/9/2011 |
| 20 | Michael Woehler | $ 185,000.00 | 7.6% | $ 13,986.00 | $ 198,986.00 | 10/27/2011 | 10/8/2011 |
| 20 | Michael Woehler | $ 175,000.00 | 7.7% | $ 13,475.00 | $ 188,475.00 | 9/1/2011 | 8/13/2011 |
| 35 | Michael Woehler | $ 241,312.50 | 7.3% | $ 17,495.16 | $ 258,807.65 | 8/14/2012 | 7/11/2012 |
| 30 | Michael Woehler | $ 200,000.00 | 7.5% | $ 15,000.00 | $ 215,000.00 | 2/3/2011 | 1/3/2011 |
| 27 | Michael Woehler | $ 225,000.00 | 7.3% | $ 16,312.50 | $ 241,312.50 | 7/10/2012 | 6/14/2012 |
| 24 | Michael Woehler | $ 225,000.00 | 7.3% | $ 16,312.50 | $ 241,312.50 | 6/3/2012 | 5/11/2012 |
| 28 | Michael Woehler | $ 200,000.00 | 7.5% | $ 14,900.00 | $ 214,900.00 | 3/26/2012 | 2/28/2012 |
| 35 | Michael Woehler | $ 241,312.50 | 7.3% | $ 17,495.16 | $ 258,807.65 | 10/23/2012 | 9/19/2012 |
| 35 | Michael Woehler | $ 241,312.50 | 7.3% | $ 17,495.16 | $ 258,807.65 | 9/18/2012 | 8/15/2012 |
| 16 | Mounir Khouri | $ 100,000.00 | 6.3% | $ 6,250.00 | $ 106,250.00 | 4/12/2011 | 3/28/2011 |
| 22 | Mounir Khouri | $ 175,000.00 | 7.5% | $ 13,125.00 | $ 188,125.00 | 6/20/2011 | 5/30/2011 |
| 18 | Mounir Khouri | $ 150,000.00 | 8.0% | $ 12,000.00 | $ 132,000.00 | 7/28/2011 | 7/11/2011 |
| 31 | Mounir Khouri | $ 200,000.00 | 9.0% | $ 18,000.00 | $ 218,000.00 | 5/12/2011 | 4/12/2011 |
| 30 | Mounir Khouri | $ 175,000.00 | 7.4% | $ 12,950.00 | $ 187,950.00 | 11/14/2011 | 10/14/2011 |
| 11 | Mounir Khouri | $ 25,000.00 | 8.0% | $ 2,000.00 | $ 27,000.00 | 11/16/2011 | 11/6/2011 |
| 20 | Mounir Khouri | $ 175,000.00 | 7.4% | $ 12,950.00 | $ 187,950.00 | 9/26/2011 | 9/7/2011 |
| 35 | Mounir Khouri | $ 100,000.00 | 8.0% | $ 8,000.00 | $ 108,000.00 | 2/1/2011 | 12/29/2010 |
| 34 | Mounir Khouri | $ 50,000.00 | 8.0% | $ 4,000.00 | $ 54,000.00 | 2/1/2011 | 12/30/2010 |
| 12 | Mounir Khouri | $ 100,000.00 | 10.0% | $ 10,000.00 | $ 110,000.00 | 8/6/2010 | 7/26/2010 |
| 16 | Mounir Khouri | $ 150,000.00 | 8.0% | $ 12,000.00 | $ 162,000.00 | 12/7/2010 | 11/22/2010 |
| 41 | Mounir Khouri | $ 100,000.00 | 8.0% | $ 8,000.00 | $ 108,000.00 | 2/1/2011 | 12/23/2010 |
| 14 | Mounir Khouri | $ 75,000.00 | 8.0% | $ 6,000.00 | $ 81,000.00 | 1/5/2011 | 12/23/2010 |
| 56 | Mounir Khouri | $ 100,000.00 | 20.0% | $ 20,000.00 | $ 120,000.00 | 10/18/2010 | 8/24/2010 |
| 42 | Mounir Khouri | $ 200,000.00 | 8.0% | $ 16,000.00 | $ 216,000.00 | 11/5/2010 | 9/25/2010 |

Confidential - Subject to Protective Order

Exhibit 1

| No. | Name | Principal | % | Interest | Total | Date | Date |
|---|---|---|---|---|---|---|---|
| 23 | D & L Enterprises | $ 30,000.00 | 7.5% | $ 2,250.00 | $ 32,250.00 | 7/7/2011 | 6/15/2011 |
| 14 | D & L Enterprises | $ 70,000.00 | 8.0% | $ 5,600.00 | $ 75,600.00 | 9/1/2010 | 8/19/2010 |
| 13 | D & L Enterprises | $ 70,000.00 | 7.0% | $ 4,900.00 | $ 74,900.00 | 7/29/2010 | 7/17/2010 |
| 21 | David T. Dahoud | $ 45,000.00 | 12.0% | $ 5,400.00 | $ 50,400.00 | 11/12/2010 | 10/23/2010 |
| 42 | David T. Dahoud | $ 49,500.00 | 11.0% | $ 5,445.00 | $ 54,945.00 | 11/5/2010 | 9/25/2010 |
| 22 | Dennis O'Leary | $ 200,000.00 | 7.5% | $ 15,000.00 | $ 215,000.00 | 12/2/2011 | 11/11/2011 |
| 22 | Dennis O'Leary | $ 125,000.00 | 6.3% | $ 7,812.50 | $ 132,812.50 | 7/7/2011 | 6/16/2011 |
| 20 | Dennis O'Leary | $ 125,000.00 | 7.5% | $ 9,375.00 | $ 134,375.00 | 4/13/2012 | 3/25/2012 |
| 30 | Dennis O'Leary | $ 250,000.00 | 10.0% | $ 25,000.00 | $ 275,000.00 | 12/5/2012 | 11/5/2012 |
| 22 | Dennis O'Leary | $ 300,000.00 | 7.5% | $ 22,500.00 | $ 322,500.00 | 2/8/2012 | 1/18/2012 |
| 28 | Dennis O'Leary | $ 250,000.00 | 7.3% | $ 18,125.00 | $ 268,125.00 | 7/19/2012 | 6/22/2012 |
| 21 | Dennis O'Leary | $ 200,000.00 | 7.0% | $ 14,000.00 | $ 214,000.00 | 7/27/2012 | 7/7/2012 |
| 15 | Dennis O'Leary | $ 100,000.00 | 8.3% | $ 8,250.00 | $ 108,250.00 | 3/7/2012 | 2/22/2012 |
| 18 | Dennis O'Leary | $ 200,000.00 | 7.3% | $ 14,500.00 | $ 214,500.00 | 3/7/2012 | 2/19/2012 |
| 18 | Dennis O'Leary | $ 300,000.00 | 8.0% | $ 24,000.00 | $ 324,000.00 | 5/23/2012 | 5/6/2012 |
| 16 | Dennis O'Leary | $ 150,000.00 | 10.0% | $ 15,000.00 | $ 165,000.00 | 8/9/2012 | 7/25/2012 |
| 21 | Dennis O'Leary | $ 100,000.00 | 10.0% | $ 10,000.00 | $ 110,000.00 | 12/17/2010 | 11/27/2010 |
| 10 | Dennis O'Leary | $ 50,000.00 | 6.8% | $ 3,375.00 | $ 53,375.00 | 7/6/2010 | 6/27/2010 |
| 15 | Dennis O'Leary | $ 150,000.00 | 6.8% | $ 10,125.00 | $ 160,125.00 | 7/6/2010 | 6/22/2010 |
| 13 | Dennis O'Leary | $ 70,000.00 | 7.0% | $ 4,900.00 | $ 74,900.00 | 7/29/2010 | 7/17/2010 |
| 18 | Dennis O'Leary | $ 51,000.00 | 6.3% | $ 3,187.50 | $ 54,187.50 | 6/8/2010 | 5/22/2010 |
| 24 | Dennis O'Leary | $ 125,000.00 | 7.9% | $ 9,875.00 | $ 134,875.00 | 11/12/2010 | 10/20/2010 |
| 23 | Dennis O'Leary | $ 100,000.00 | 8.7% | $ 8,650.00 | $ 108,650.00 | 10/2/2010 | 9/10/2010 |
| 26 | Dennis O'Leary | $ 100,000.00 | 7.7% | $ 7,690.00 | $ 107,690.00 | 9/27/2010 | 9/2/2010 |
| 14 | Dennis O'Leary | $ 132,000.00 | 4.5% | $ 5,940.00 | $ 137,940.00 | 2/19/2009 | 2/6/2009 |
| 15 | Dennis O'Leary | $ 75,000.00 | 7.5% | $ 5,625.00 | $ 80,625.00 | 4/2/2012 | 3/19/2012 |

Confidential - Subject to Protective Order

Exhibit 1

| # | Name | Principal | Rate | Interest | Total | Date | Date |
|---|------|-----------|------|----------|-------|------|------|
| 20 | Gary Frey | $ 50,000.00 | 8.0% | $ 4,000.00 | $ 54,000.00 | 2/3/2011 | 1/15/2011 |
| 19 | Gary Frey | $ 25,000.00 | 7.5% | $ 1,875.00 | $ 26,875.00 | 12/13/2010 | 11/25/2010 |
| 23 | Gary Frey | $ 50,000.00 | 7.5% | $ 3,750.00 | $ 53,750.00 | 11/11/2010 | 11/10/2010 |
| 18 | Gary Sabia | $ 150,000.00 | 8.0% | $ 12,000.00 | $ 162,000.00 | 5/23/2012 | 5/6/2012 |
| 35 | International Electric Ac. Inc | $ 53,625.00 | 7.3% | $ 3,887.81 | $ 57,512.81 | 8/13/2012 | 7/10/2012 |
| 30 | International Electric Ac. Inc | $ 50,000.00 | 7.3% | $ 3,625.00 | $ 53,625.00 | 7/9/2012 | 6/9/2012 |
| 35 | International Electric Ac. Inc | $ 57,512.00 | 7.3% | $ 4,169.62 | $ 61,681.62 | 9/17/2012 | 8/14/2012 |
| 41 | Ira Stein | $ 150,000.00 | 8.0% | $ 12,000.00 | $ 162,000.00 | 2/1/2011 | 12/23/2010 |
| 21 | Issa Rizk | $ 50,000.00 | 7.5% | $ 3,750.00 | $ 53,750.00 | 7/7/2011 | 6/17/2011 |
| 18 | Issa Rizk | $ 100,000.00 | 8.0% | $ 8,000.00 | $ 108,000.00 | 7/28/2013 | 7/11/2013 |
| 22 | Issa Rizk | $ 100,000.00 | 7.5% | $ 7,500.00 | $ 107,500.00 | 6/20/2011 | 5/30/2011 |
| 24 | Issa Rizk | $ 100,000.00 | 9.0% | $ 9,000.00 | $ 109,000.00 | 5/13/2011 | 4/20/2011 |
| 30 | Issa Rizk | $ 200,000.00 | 7.4% | $ 14,800.00 | $ 214,800.00 | 11/14/2011 | 10/14/2011 |
| 18 | Issa Rizk | $ 170,000.00 | 7.4% | $ 12,580.00 | $ 182,580.00 | 9/26/2011 | 9/9/2011 |
| 26 | Issa Rizk | $ 100,000.00 | 9.0% | $ 9,000.00 | $ 109,000.00 | 5/29/2012 | 5/4/2012 |
| 35 | Jack Tenkman | $ 168,000.00 | 7.3% | $ 12,180.00 | $ 180,180.00 | 7/9/2012 | 6/5/2012 |
| 35 | Jack Tenkman / Amylin | $ 72,000.00 | 7.3% | $ 5,220.00 | $ 80,437.50 | 7/9/2012 | 6/5/2012 |
| 28 | Jamal Sameh | $ 200,000.00 | 7.0% | $ 14,000.00 | $ 214,000.00 | 11/27/2012 | 10/31/2012 |
| 30 | Jan Williford | $ 50,000.00 | 9.0% | $ 4,500.00 | $ 54,500.00 | 7/12/2012 | 6/12/2012 |
| 35 | Janet Combs | $ 50,000.00 | 7.3% | $ 3,625.00 | $ 53,625.00 | 10/15/2012 | 9/11/2012 |

Confidential - Subject to Protective Order

Exhibit 1

| # | Name | Principal | Rate | Interest | Total | Date | Date |
|---|---|---|---|---|---|---|---|
| 40 | Nalia Goldenberg | $ 16,200.00 | 8.0% | $ 1,295.00 | $ 17,496.00 | 2/1/2011 | 12/24/2010 |
| 42 | Nalia Goldenberg | $ 15,000.00 | 8.0% | $ 1,200.00 | $ 16,200.00 | 11/5/2010 | 9/25/2010 |
| 21 | Panel Fab/ Williford | $ 400,000.00 | 8.0% | $ 32,000.00 | $ 432,000.00 | 12/5/2012 | 11/15/2012 |
| 28 | Panel Fab/ Williford | $ 800,000.00 | 8.0% | $ 64,000.00 | $ 864,000.00 | 2/19/2013 | 1/23/2013 |
| 7 | Panel Fab/ Williford | $ 250,000.00 | 7.5% | $ 18,750.00 | $ 268,750.00 | 6/4/2012 | 5/29/2012 |
| 19 | Paul Barnes | $ 30,000.00 | 7.0% | $ 2,100.00 | $ 32,100.00 | 8/6/2010 | 7/19/2010 |
| 28 | Rasam El-Saleh | $ 100,000.00 | 7.5% | $ 7,500.00 | $ 107,500.00 | 8/20/2012 | 7/24/2012 |
| 21 | Rasam El-Saleh | $ 100,000.00 | 7.5% | $ 7,500.00 | $ 107,500.00 | 11/12/2012 | 10/23/2012 |
| 12 | Robert Harrison | $ 250,000.00 | 9.0% | $ 22,500.00 | $ 272,500.00 | 12/21/2011 | 12/10/2011 |
| 18 | Robert Harrison | $ 300,000.00 | 7.3% | $ 21,750.00 | $ 321,750.00 | 2/20/2012 | 2/3/2012 |
| 28 | Robert Harrison | $ 347,490.00 | 7.5% | $ 26,061.75 | $ 373,551.75 | 3/26/2012 | 2/28/2012 |
| 11 | Robert Harrison | $ 200,000.00 | 8.0% | $ 16,000.00 | $ 216,000.00 | 5/14/2012 | 5/4/2012 |
| 30 | Robert Harrison | | 0.0% | $ 29,000.00 | | 7/8/2013 | 6/8/2013 |
| 30 | Robert Veison | $ 100,000.00 | 7.4% | $ 7,400.00 | $ 107,400.00 | 11/14/2011 | 10/14/2011 |
| 11 | Robert Veison | $ 30,000.00 | 8.0% | $ 2,400.00 | $ 32,400.00 | 11/16/2011 | 11/6/2011 |
| 16 | Robert Veison | $ 25,000.00 | 10.0% | $ 2,500.00 | $ 27,500.00 | 8/27/2009 | 8/12/2009 |
| 22 | Robert Williford | $ 100,000.00 | 7.0% | $ 7,000.00 | $ 107,000.00 | 9/2/2011 | 8/12/2011 |
| 31 | Robert Woehler | $ 200,000.00 | 31.0% | $ 62,000.00 | $ 262,000.00 | 5/9/2011 | 4/9/2011 |
| 20 | Robert Woehler | $ 200,000.00 | 7.3% | $ 14,600.00 | $ 214,600.00 | 3/21/2011 | 3/2/2011 |
| 24 | Steve Williford | $ 290,000.00 | 9.0% | $ 26,100.00 | $ 316,100.00 | 12/16/2011 | 11/23/2011 |
| 12 | Steve Williford | $ 250,000.00 | 9.0% | $ 22,500.00 | $ 272,500.00 | 12/21/2011 | 12/10/2011 |

Confidential – Subject to Protective Order

Exhibit 1

| | | Principal | Rate | Interest | Total | | |
|---|---|---|---|---|---|---|---|
| 22 | Steve Williford | $ 500,000.00 | 8.9% | $ 44,500.00 | $ 544,500.00 | 6/7/2011 | 5/17/2011 |
| 28 | Steve Williford | $ 888,248.00 | 7.5% | $ 66,618.60 | $ 954,866.60 | 3/26/2012 | 2/28/2012 |
| 11 | Steve Williford | $ 200,000.00 | 8.0% | $ 16,000.00 | $ 216,000.00 | 5/14/2012 | 5/1/2012 |
| 41 | Steve Williford | $ 291,500.00 | 8.0% | $ 23,320.00 | $ 314,820.00 | 2/1/2011 | 12/23/2010 |
| 15 | Steve Williford | $ 300,000.00 | 17.0% | $ 51,000.00 | $ 351,000.00 | 1/28/2011 | 1/14/2011 |
| 15 | Steve Williford | $ 300,000.00 | 17.0% | $ 51,000.00 | $ 351,000.00 | 1/28/2011 | 1/14/2011 |
| 16 | Steve Williford | $ 200,000.00 | 6.5% | $ 13,000.00 | $ 213,000.00 | 10/1/2010 | 9/16/2010 |
| 15 | Steve Williford | $ 200,000.00 | 8.0% | $ 16,000.00 | $ 216,000.00 | 8/6/2010 | 7/23/2010 |
| 18 | Steve Williford | $ 100,000.00 | 7.0% | $ 7,000.00 | $ 107,000.00 | 7/9/2010 | 6/22/2010 |
| 16 | Steve Williford | $ 250,000.00 | 7.7% | $ 19,225.00 | $ 269,225.00 | 11/3/2010 | 10/19/2010 |
| 30 | Steve Williford | | 0.0% | $ 55,100.00 | | 7/8/2013 | 6/8/2013 |
| 23 | Sudsru, LLC | $ 10,000.00 | 7.5% | $ 750.00 | $ 10,750.00 | 7/7/2011 | 6/15/2011 |
| 21 | Ted Byer | $ 300,000.00 | 7.0% | $ 21,000.00 | $ 321,000.00 | 2/25/2010 | 2/5/2010 |
| 7 | TM Wanner Inc. Retire Tr. | $ 400,000.00 | 6.0% | $ 24,000.00 | $ 424,000.00 | 12/6/2012 | 11/30/2012 |
| 35 | TM Wanner Inc. Retire Tr. | $ 100,000.00 | 7.3% | $ 7,250.00 | $ 107,250.00 | 10/15/2012 | 9/11/2012 |
| | TOTAL | $ 32,835,713.65 | | TOTAL | $ 37,944,703.73 | | |

Confidential - Subject to Protective Order

Exhibit 1

**Summary Sheet — From Plaintiff's Attorneys**

| Deposited Funds | | Withdrawals |
|---|---|---|
| Initial Deposits | 34,392,427.55 | |
| 2007 | 1,565,546.00 | 1,700,293.00 |
| 2008 | 339,165.00 | 1,178,783.00 |
| 2009 | 422,685.00 | 2,719,281.00 |
| 2010 | 4,432,570.00 | 1,156,139.00 |
| 2011 | 6,228,142,41 | 7,762,561.00 |
| 2012 | 9,440,130.00 | 12,880,099.00 |
| 2013 | 4,268,874.00 | 6,870,210.78 |
| TOTALS | 61,089,239.96 | 34,267,366.78 |

- 34,267,366.78 (Total Withdrawals)

26,821,877.96 The Court must take into account the facts provided by Defendant

## Missing Withdrawals, Deposits, Expenses, Etc.

- 10,400,000.00    Withdrawals left out from the Plaintiffs spread sheets by only 6 individuals – Missing millions more.

- 2,000,000.00    Cash left on Deposits/Bank Accounts (Clients monies) – Have never been taken into consideration by anybody and Never Subtracted.

- 4,834,415.23    Business Expense over 7½ years (Same number as previously provided), and never taken into consideration when calculating a loss.

- 6,828,392.20    Investment Loss, same number as previously provided and never taken into consideration.

= + 1,240,929.47    A net surplus based on the $26,821,877.96 claim as above.

     ???    Missing withdrawals from 1999 – 2006.

The above shows the Court where the above total of $28,062,807.43 were allocated and Plaintiff's attorneys act as if these events never existed or in fact took place. Based on the above, Defendant makes the claim that $15,000,000.00 of withdrawals by Plaintiff's have been purposely left out, together with $2,000,000.00 left in bank accounts, the amount of $2,450,084.14 taken from Kris Galemmo, the $6,828,392.20 actual investment loss (low end), and $4,834,415.23 in Business expenses, arriving at an amount of $31,112,891.57 that Plaintiff's attorneys claim never happened. Defendant requests the Court to take action against all of those who have made a claim of fiduciary responsibility to the Court, thus purposely and willfully misleading the Court in the Case No. 1:13-cv-00883 and victimizing their own clients by these actions.

Exhibit 2

Confidential - Subject to Protective Order

Exhibit 2

Confidential – Subject to Protective Order

Exhibit 2

Table too faded for reliable full transcription; best-effort extraction of the left identifier columns and readable values.

| Name | State | Acct | Amount | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| John Erickson | OH | 45069 | 72,500.00 | | | | | | | | | $0.00 |
| John Jackson IRA | OH | 45067 | 423,234.17 | | | | | | | $34,250.00 | $11,434,750.00 | $0.00 |
| Carol Thomas | OH | 45040 | 29,473.00 | | | | | | | $300,000.00 | $172,234.17 | $0.00 |
| Richard Thomas IRA | OH | 45040 | 24,973.00 | | | | | | | | $26,473.00 | ($149,349.00) |
| Corby Trevino | OH | 41207 | 7,673.00 | | | | | | | | | $0.00 |
| James Urban IRA | CA | 45014 | 129,000.00 | $150,000.00 | | ($45,049.00) | | | $432,841.33 | | ($59,500.00) |
| James Ullan Trust | CA | 45014 | 200,000.00 | | | | ($100,000.00) | ($125,000.00) | | $17,473.00 | $0.00 |
| James Vald | IL | 41416 | 200,000.00 | | | | | | | $129,000.00 | $0.00 |
| Michael Vald | IL | 41416 | 200,000.00 | | | | | | | $200,000.00 | $0.00 |
| Victoria Vickery | OH | 41416 | 200,000.00 | | | $500,000.00 | | | $23,901.18 | $175,501.18 | ($143,750.00) |
| Vickers, Robert SEP | OH | 41243 | 100,000.00 | 190,000.00 | | | | | | $200,000.00 | $0.00 |
| William Wilkon IRA | OH | 41243 | 288,000.00 | | ($75,049.00) | | | | | $100,000.00 | ($143,750.00) |
| Margaret Walkon IRA | OH | 41371 | 480,849.00 | $31,303.00 | | $112,200.00 | $125,000.00 | | | $190,000.00 | $525,000.00 |
| Tal Wanner, Inc Retirement Trust | OH | 41371 | 19,461.40 | ($150,060.00) | | | $84,000.00 | ($132,000.00) | | $428,305.00 | $0.00 |
| Andy Warner | | | 500,000.00 | | | | | | | $480,044.00 | ($450,000.00) |
| Thomas Warner | | | 300,000.00 | | | | | $125,000.00 | | $14,461.00 | $0.00 |
| John Wadsman | OH | 41834 | 500,000.00 | | | | | | | $500,000.00 | $0.00 |
| | OH | 45068 | 200,000.00 | | | | | | | $300,000.00 | $0.00 |
| Ulan Wilkor | CA | 33620 | 1,900,000.00 | $296,047.00 | | $345,413.00 | $25,000.00 | ($700,300.00) | $1,000,000.00 | $1,900,000.00 | $1,000,000.00 |
| Mel Puckers | CA | 33640 | 600,000.00 | ($142,992.00) | | ($361,095.00) | | ($17,300.00) | ($970,000.00) | $461,449.00 | ($1,100,000.00) |
| Anthony Wilkor | CA | 41061 | 98,000.00 | | | ($1,817,320.00) | | ($12,925,104.00) | ($953,504.00) | $1,534,325.00 | ($6,425,704.00) |
| Douglas Wilkor | WA | 36024 | 114,616.00 | | | | | | | $860,000.00 | $0.00 |
| Douglas Wilkor IRA | WA | 36024 | 736,048.00 | | | | | | | $186,000.00 | $0.00 |
| John Wrefler | | 41654 | 189,000.00 | | | | ($53,000.00) | | ($30,070.00) | $114,616.00 | ($55,000.00) |
| Kenneth Wrefler IRA | KY | 41618 | 151,549.00 | | | | | | ($10,070.00) | $126,504.01 | $0.00 |
| Mark Wrefler IRA | | 41165 | 48,876.00 | | | | | | | $189,000.00 | ($53,000.00) |
| Mark Wrefler | | 41165 | 60,000.00 | | | | | | | $151,562.00 | $0.00 |
| Michael Wrefler IRA | KY | 41165 | 118,750.00 | | | | | | | $48,875.00 | $0.00 |
| Michael Wrefler | KY | 41618 | 60,000.00 | | $306,000.00 | $117,000.00 | $96,135.00 | ($105,050.00) | ($800,000.00) | $578,635.00 | ($370,000.00) |
| Amanda Wrefler IRA | | | 62,000.00 | | ($107,400.00) | $120,000.00 | | ($11,040.00) | | $148,750.00 | ($870,000.00) |
| Holly Wrefler IRA | | | 21,143.34 | | | | | | ($196,750.00) | $216,750.00 | ($21,040.00) |
| Joshua Wrefler IRA | | | 10,165.00 | | | | | | | $99,665.00 | ($107,400.00) |
| Steve Wrefler | FL | 34285 | 29,250.19 | | | | | | | $32,184.08 | $0.00 |
| Steve Wrefler IRA | FL | 34285 | 41,815.00 | ($10,970.00) | | | | | | $31,185.00 | $0.00 |
| Steve Wrefler FBO Amanda Wrefler | FL | 41023 | 307,450.00 | | ($84,050.00) | | | ($153,000.00) | | $427,254.10 | $0.00 |
| Steve Wrefler FBO Joshua Wrefler | OH | 41023 | 50,434.74 | | | ($135,043.00) | | | $152,000.00 | $280,114.00 | ($171,792.00) |
| Lawrence Wrefler | XY | 41027 | 93,800.00 | | | | | | ($4,900.00) | $402,743.90 | $0.00 |
| Lawrence Wrefler IRA | XY | 41017 | 33,843.43 | | | | | | | $33,843.43 | $0.00 |
| Mark Zawacki | OH | 41029 | 100,000.00 | | | | $30,000.00 | | | $181,900.00 | $0.00 |
| | | | | | | | | | $179,000.00 | $130,000.00 | $0.00 |
| **Totals** | | | $34,342,421.35 | $423,646.96 | ($1,178,731.56) | $338,185.00 | $4,445,378.00 | ($2,719,141.00) | $8,329,225.05 | ($1,763,543.76) | |

Confidential - Subject to Protective Order

Exhibit 2

|  | date | out |  | Client 3 |
|---|---|---|---|---|
| 4670 | 12/21/2010 | $99,000.00 | | |
| 4670 | 12/27/2010 | $1,200.00 | | |
| 4670 | 2/4/2010 | $4,000.00 | | |
| 4670 | 8/29/2011 | $107,000.00 | | |
| 4670 | 10/3/2011 | $400,000.00 | check | |
| 4670 | 12/12/2011 | $3,000.00 | check | |
| 4670 | 12/6/2011 | $115,000.00 | check | |
| 4670 | 12/28/2011 | $100,000.00 | check | |
| 4670 | 2/10/2012 | $200,000.00 | | |
| 4670 | 2/14/2012 | $100,000.00 | | |
| 4670 | 2/8/2012 | $322,500.00 | check | |
| 4670 | 3/8/2012 | $322,750.00 | check | |
| 4670 | 3/14/2012 | $485.00 | check | for referal |
| 4670 | 4/13/2012 | $134,375.00 | check | |
| 4670 | 4/15/2012 | $100,000.00 | check | |
| 4670 | 5/25/2012 | $324,000.00 | check | |
| 4670 | 6/14/2012 | $227,000.00 | check | |
| 4670 | 6/15/2012 | $200,000.00 | check | |
| 4670 | 7/27/2012 | $214,000.00 | check | |
| 4670 | 7/27/2012 | $270,625.00 | check | |
| 4670 | 8/27/2012 | $300,000.00 | check | |
| 4670 | 10/1/2012 | $500,000.00 | check | |
| 4670 | 11/1/2012 | $20,000.00 | check | |
| 4670 | 12/21/2012 | $100,000.00 | check | |
| 4670 | 12/10/2012 | $250,000.00 | check | |
| 4670 | 12/10/2012 | $25,000.00 | check | |
| 8448 | 1/12/2009 | $33,200.00 | check | |
| 8448 | 3/3/2009 | $139,920.00 | check | |
| 8448 | 3/10/2009 | $139,920.00 | check | |
| 8448 | 9/10/2009 | $100,000.00 | check | |
| 8448 | 5/20/2009 | $108,000.00 | check | |
| 8448 | 11/2/2009 | $81,000.00 | check | |
| 8448 | 5/13/2010 | | | |
| | | | | |
| 8448 | 1/29/2009 | | | |
| 8448 | 1/4/2013 | | | |
| 3120 | 6/28/2008 | | | |
| 3120 | 7/11/2008 | | | |
| 3120 | 8/18/2008 | $139,750.00 | check | 3002 |
| 3120 | 8/28/2008 | | | |
| 3120 | 9/12/2008 | $77,025.00 | check | 1241 |
| 3120 | 9/25/2008 | | check | |
| 3120 | 10/9/2008 | $86,100.00 | check | 3024 |
| 3120 | 10/30/2008 | | | |
| 3120 | 11/24/2008 | $106,410.00 | check | 3120 |
| 3120 | 12/9/2008 | | | |

Exhibit 3

| | | | | |
|---|---|---|---|---|
| 3120 | 12/12/2008 | $155,250.00 | check | 3025 |
| 3120 | 10/31/2008 | | | |
| | | | | |
| 4670 | 5/10/2010 | $175,000.00 | check | 1077 |
| 4670 | 7/8/2010 | $213,500.00 | check | 1122 |
| 4670 | 7/12/2010 | | check from hunting | |
| 4670 | 7/21/2010 | | check from hunting | |
| 4670 | 1/29/2010 | $74,900.00 | check | 1140 |
| 4670 | 8/16/2010 | $168,000.00 | check | 1177 |
| 4670 | 8/13/2010 | | check from hunting | |
| 4670 | 8/31/2010 | | check from hunting | |
| 4670 | 9/27/2010 | $107,690.00 | check | 1220 |
| 4670 | 10/5/2010 | $107,690.00 | check | 1203 |
| 4670 | 11/12/2010 | $134,875.00 | checj | 1339 |
| 4670 | 11/18/2010 | | check from fith 3rd | |
| 4670 | 12/17/2010 | $100,000.00 | check | 1149 |
| 4670 | 2/4/2011 | $115,000.00 | check | 1470 |
| 4670 | 3/22/2011 | | check | |
| 4670 | 4/11/2011 | $106,250.00 | check | 1419 |
| 4670 | 4/18/2011 | | check from fith 3rd | |
| 4670 | 5/23/2011 | $322,525.00 | check | 1501 |
| 4670 | 6/8/2011 | | check from fith 3rd | |
| 4670 | 7/8/2011 | $132,812.50 | check | 1592 |
| 4670 | 7/12/2011 | | check | |
| 4670 | 10/3/2011 | $400,000.00 | check | 1682 |
| 4670 | 10/24/2011 | | check from fith 3rd | |
| 4670 | 12/6/2011 | $115,000.00 | check | 1761 |
| 4670 | 12/12/2011 | $3,000.00 | check | 1765 |
| 4670 | 12/28/2011 | $100,000.00 | check | 1817 |
| 4670 | 1/9/2012 | | check from fith 3rd | |
| 4670 | 3/16/2012 | | check from hunting | |
| 4670 | 4/30/2012 | | check from fith 3rd | |
| 4670 | 5/20/2012 | | check from fith 3rd | |
| 4670 | 7/6/2012 | | check from fith 3rd | |
| 4670 | 8/1/2012 | | check from fith 3rd | |
| 4670 | 8/1/2012 | | check from hunting | |

$7,982,752.50

| | | | | |
|---|---|---|---|---|
| 4670 | 5/2/2013 | | check from fith 3rd | |
| 4670 | 6/7/2013 | $250,000.00 | check from | 2822 |
| 4670 | 6/10/2013 | $43,400.00 | | 2825 |

$8,276,152.50

Exhibit 3

| Acct | Date | IN | OUT | Description |
|------|------|-----|-----|-------------|
| 3120 | 05/20/2007 | 31,350.00 | | |
| 3120 | 05/24/2007 | | 33,136.00 | Check 2253# |
| 3120 | 07/09/2007 | | 52,000.00 | Check 2301# |
| 3120 | 10/18/2007 | | 2,000.00 | Check 2004# |
| | | | | |
| 3120 | 03/10/2008 | 44,237.50 | | |
| 3120 | 03/20/2008 | | 47,387.50 | Check 2098# |
| 3120 | 10/10/2008 | 25,000.00 | | |
| 3120 | 10/20/2008 | | 43,000.00 | Check 3077 |
| 8448 | 01/21/2009 | 30,000.00 | | |
| 8448 | 02/02/2009 | | 31,500.00 | Check 1079# |
| 8448 | 03/11/2009 | 100,000.00 | | |
| 8448 | 03/24/2009 | | 110,000.00 | Check 1118# |
| 8448 | 04/01/2009 | 111,000.00 | | |
| 8448 | 04/13/2009 | | 83,000.05 | Check 1225# |
| 8448 | 04/15/2009 | | 39,100.00 | Check 1230# |
| 8448 | 05/01/2009 | 150,000.00 | | Dep. US Bank |
| 8448 | 05/19/2009 | 130,000.00 | | Dep. US Bank |
| 8448 | 06/04/2009 | | 140,400.00 | Check 1128# |
| 8448 | 06/08/2009 | 68,000.50 | | Dep. $5^{th}/3^{rd}$ |
| 8448 | 06/17/2009 | 39,000.65 | | Dep. US Bank |
| 8448 | 06/23/2009 | | 73,830.00 | Check 1034# |
| 8448 | 07/13/2009 | | 44,070.00 | Check 1056# |
| 8448 | 07/15/2009 | 125,000.05 | | Dep. US Bank |
| 8448 | 07/29/2009 | | 125,000.05 | Check 1059# |
| 8448 | 07/29/2009 | 75,000.00 | | Dep. US Bank |
| 8448 | 08/11/2009 | | 75,000.00 | Check 1134# |
| 8448 | 08/14/2009 | | 6,750.00 | Check 1133# |
| 5618 | 08/17/2009 | 100,000.00 | | |
| 4670 | 08/18/2009 | | 15,000.00 | |
| 8448 | 09/02/2009 | | 107,200.00 | Check 1185# |
| 8448 | 09/25/2009 | 140,000.00 | | |
| 8448 | 10/16/2009 | | 12,000.00 | Check 1199# |
| 8448 | 11/04/2009 | | 327,000.00 | Check 1332# |
| 8448 | 11/05/2009 | 102,500.00 | | Chk. US Bank |
| 8448 | 11/12/2009 | 50,000.00 | | Chk. US Bank |
| 8448 | 11/17/2009 | | 110,187.50 | Check 1342# |
| 5618 | 11/23/2009 | 72,500.00 | | |
| 5618 | 11/23/2009 | 100,000.00 | | |
| 8448 | 11/30/2009 | | 53,500.00 | Check 1349# |
| 8448 | 12/08/2009 | 50,000.00 | | Chk. US Bank |
| 8448 | 12/16/2009 | | 53,750.00 | Check 1349# |
| | | | | |
| 8448 | 01/06/2010 | | 108,000.00 | Check 1301# |
| 8448 | 01/06/2010 | 157,500.00 | | Chk. US Bank |
| 8448 | 01/17/2010 | | 50,000.00 | Check 1315# |
| 8448 | 01/22/2010 | | 126,400.00 | Check 1322# |
| 8448 | 02/02/2010 | | 7,125.00 | Check 1246# |
| 8448 | 02/05/2010 | 300,000.00 | | Chk. US Bank |
| 8448 | 02/25/2010 | | 321,000.00 | |
| 8448 | 03/10/2010 | 75,000.00 | | |
| 8448 | 04/09/2010 | 25,000.00 | | |

Exhibit 4

| Acct | Date | IN | OUT | Description |
|------|------|-----|------|-------------|
| 4670 | 05/21/2010 | | 144,000.00 | Check 1032# |
| 4670 | 05/22/2010 | 200,000.00 | | Chk. US Bank |
| 4670 | 05/25/2010 | | 2,000.00 | Check 1035# |
| 4670 | 06/08/2010 | | 16,000.00 | Check 1042# |
| 4670 | 07/21/2010 | 150,000.00 | | Chk. US Bank |
| 4670 | 08/10/2010 | 35,000.00 | | Chk. US Bank |
| 4670 | 08/11/2010 | 150,000.00 | | Chk. US Bank |
| 4670 | 09/10/2010 | | 36,750.00 | Check 1208# |
| 4670 | 10/14/2010 | 50,000.00 | | Chk. US Bank |
| 4670 | 11/08/2010 | 50,000.00 | | Chk. US Bank |
| 4670 | 11/08/2010 | | 18,750.00 | Check 1134# |
| 4670 | 11/16/2010 | | 50,000.00 | Check 1344# |
| 4670 | 11/30/2010 | | 4,000.00 | Check 1258# |
| 4670 | 12/02/2010 | 45,000.00 | | Chk. US Bank |
| 4670 | 12/10/2010 | | 42,000.00 | Check 1146# |
| 4670 | 01/06/2011 | 60,000.00 | | Chk. $5^{th}/3^{rd}$ |
| 4670 | 04/08/2011 | | 50,000.00 | Check 1417# |
| 4670 | 04/12/2011 | 100,000.00 | | Chk. US Bank |
| 4670 | 04/20/2011 | | 106,000.00 | Check 1373# |
| 4670 | 06/01/2011 | | 60,000.00 | Check 1508# |
| 4670 | 08/05/2011 | | 12,000.00 | |
| 4670 | 08/11/2011 | | 60,000.00 | Check 5888# |
| 4670 | 09/08/2011 | | 25,000.00 | Check 1638# |
| 4670 | 11/02/2011 | | 25,000.00 | Check 1724# |
| 4670 | 01/06/2012 | 40,000.00 | | |
| 4670 | 02/14/2012 | | 50,000.00 | Wire x-fer |
| 4670 | 03/13/2012 | | 20,000.00 | Check 1539# |
| 4670 | 03/15/2012 | | 120,000.00 | Check 1944# |
| 4670 | 04/08/2012 | | 50,000.00 | Dir.Xfer.USBANK |
| 4670 | 05/25/2012 | | 30,000.00 | Check 2066# |
| 4670 | 06/05/2012 | | 190,000/00 | Check 2026# |
| 4670 | 06/06/2012 | 175,000.00 | | |
| 4670 | 07/13/2012 | | 15,750.00 | Check |
| 4670 | 07/25/2012 | | 25,000.00 | Check 2187# |
| 4670 | 08/03/2012 | | 25,750.00 | Check 2146# |
| 4670 | 09/06/2012 | | 300,000.00 | Check 2232# |
| 4670 | 10/17/2012 | | 40,000.00 | Check 2387# |
| 4670 | 10/25/2012 | | 23,000.00 | Check 2395# |
| 4670 | 11/05/2012 | | 25,000.00 | Check |
| 4670 | 11/12/2012 | | 75,000.00 | Check 2351# |
| 4670 | 12/14/2012 | | 65,000.00 | Wire->5/3$^{rd}$BNK |
| 4670 | 01/25/2013 | | 30,000.00 | Check |
| 4670 | 04/20/2013 | | 200,000.00 | Wire x-fer |
| 4670 | 06/13/2013 | | 54,000.00 | Check 2827# |
| | | $3,156,087.50 | $4,187,336.00 | |

Exhibit 4

## Funds Sent out to Clients

| Client | Money Sent out. |
|---|---|
| 1. | Missing Information |
| 2. | 67,500.00 |
| 3. | 185,000.00 |
| 4. | 30,200.00 |
| 5. | 132,848.00 |
| 6. | 932,000.00 |
| 7. | 63,426.00 |
| 8. | 176,166.00 |
| 9. | 4,341,336.00 |
| 10. | 150,000.00 |
| 11. | 545,000.00 |
| 12. | 2,639,300.00 |
| 13. | 171,598.00 |
| 14. | 495,000.00 |
| 15. ) Partners combined | – |
| 16. ) | 10,917,440.24 |
| 17. | 496,000.00 |
| 18. | 253,000.00 |
| 19. | 248,000.00 |
| 20. | 182,000.00 |
| 21. | 81,000.00 |
| 22. | 268,354.00 |
| 23. | 51,317.00 |
| 24. | 624,500.00 |
| 25. | 198,514.00 |
| 26. | 4,500.00 |
| 27. | 117,832.00 |
| 28. | 351,178.00 |
| 29. | 247,901.00 |
| 30. | 82,740.00 |
| 31. | 297,231.00 |
| 32. | 75,000.00 |
| 33. | 31,000.00 |
| 34. | 7,781,926.75 |
| 35. | Individual |
| 36. | + |
| 37. | LLC's |
| 38. | 320,003.40 |
| 39. | 157,500.00 |
| 40. | |
| 41. | 1,833,836.00 |
| 42. | 22,200.00 |
| 43. | 15,000.00 |
| 44. | 8,276,152.50 |
| 45. | 239,152.00 |
| 46. | 977,764.00 |
| C/F | 44,380,415.89 |

Exhibit 5

| Client | | Money Sent out. |
|--------|---|---|
| | B/F | 44,380,415.89 |
| 47. | | 55,650.00 |
| 48. | | 258,951.00 |
| 49. | | 248,937.00 |
| 50. | | 154,000.00 |
| 51. | | 740,000.00 |
| 52. | | 650,000.00 |
| 53. | | 470,000.00 |
| 54. | | 3,630,787.50 |
| 55. | | 3,320,051.55 |
| 56. | | |
| 57. | | 46,989.00 |
| 58. | | 30,000.00 |
| 59. | | 4,206,111,60 |
| 60. | | Missing Docs |
| 61. | | 9,648,850.66 |
| 62. | | 108,527.00 |
| 63. | | 496,000.00 |
| 64. | | 2,959,000.00 |
| 65. | | |
| 66. | | 436,000.00 |
| 67. | | 53,625.00 |
| 68. | | Missing Docs |
| 69. | | 586,000.00 |
| 70. | | 574,641.00 |
| 71. | | 175,000.00 |
| 72. | | Missing Docs |
| 73. | | Missing Docs |
| 74. | | 386,932.00 |
| 75. | | 11,000.00 |
| 76. | | 25,022.00 |
| 77. | | 214,500.00 |
| 78. | | 85,200.00 |
| 79. | | 437,270.25 |

TOTAL     $74,389,461.45 ) **Withdrawals from other clients
not on the victim sheet**

$36,581,148.97 ) **Victims withdrawals from restitution
sheet provided by government.**

TOTAL     $110,970,610.04

Exhibit 5

M Gmail

Glen Allen <glenalan11@gmail.com>

## Update
2 messages

Glen Allen <glenalan11@gmail.com>
To: "Benjamin G. Dusing" <bdusing@bgdlaw.com>, "Angela M. Hayden" <ahayden@bgdlaw.com>

Tue, Apr 8, 2014 at 11:25 AM

Ben,

2) I'm concerned and having issue's with us not getting the actual number that was invested in queen city investments, the actual lost on real investments, total amount of money that has been traded, total cost of operations/salary's, total amount sent out to the investors.
I've been saying from the beginning these facts are not going to hurt me, And this will also show that we were working hard and actual investing money.

Glen

Benjamin G. Dusing <bdusing@bgdlaw.com>
To: Glen Allen <glenalan11@gmail.com>
Cc: "Angela M. Hayden" <ahayden@bgdlaw.com>

Tue, Apr 8, 2014 at 11:20 PM

lets discuss all of these over the phone.  i understand what you're saying.

Sent from my iPad
[Quoted text hidden]

Exhibit 6

**Glen Allen** <glenalan11@gmail.com>    Sun, Aug 10, 2014 at 10:26 PM
To: "Angela M. Hayden" <ahayden@bgdlaw.com>

just coming in as a loan then right back out.  Not sure if that helps. But again the government is missing well over 40-50 million in loans that are not on the loan sheet that we agreed on.

[Quoted text hidden]

Exhibit 7

# Gmail
by Google

## Email from John Rush

**Glen Allen** <glenalan11@gmail.com>                                    Tue, Feb 18, 2014 at 10:31 PM
To: "Benjamin G. Dusing" <bdusing@bgdlaw.com>, "Angela M. Hayden" <ahayden@bgdlaw.com>, "Jason C. Kuhlman" <jkuhlman@bgdlaw.com>

Ben
Not sure it was attached to the last email so here it is again.

Glen

**From:** John Rush <jake45242@yahoo.com>
**Date:** October 1, 2013, 6:11:10 PM EDT

**To:** Kris Galemmo <kgalemmo@hotmail.com>
**Subject: Re: Glen ---your son-in-law & my friend.......**
**Reply-To:** John Rush <jake45242@yahoo.com>

I can now see why you did not "appreciate" my email note dated 8/18). It now appears that it takes a monster to co-exist with a monster. I can only hope that you both spend many decades in prison for the atrocities you have perpetrated toward so many innocents. This says it all:  http://m.bizjournals.com/cincinnati/news/2013/10/01/lawsuit-claims-galemmos-wife-aided.html?ana=twt&r=full

Exhibit 8

# Gmail

## (no subject)

**Kris Galemmo** <kgalemmo@hotmail.com>
To: glenalan11@gmail.com

Sun, Sep 28, 2014 at 3:12 PM

Sent from my iPhone

Happy New Year!
U r husband is a
GD crook! -
Carolyn Ayera &
me wish u the
woest for 2014!

**photo.PNG**
91K

Exhibit 8



**Kristine Galemmo <kgalemmo@stanthonygreenvillesc.org>**

## Fwd: Kristine Galemmo
1 message

**Sally Barker** <sbarker@stanthonygreenvillesc.org>                 Sun, Aug 30, 2015 at 9:00 PM

To: Kristine Galemmo <kgalemmo@stanthonygreenvillesc.org>

I will be there for you and what you want to tell Fr. Pat is fine with me.
———— Forwarded message ————
From: **John Rush** <jake45242@yahoo.com>
Date: Fri, Aug 28, 2015 at 11:27 AM
Subject: Kristine Galemmo
To: sbarker@stanthonygreenvillesc.org

Ms. Barker,

    Read over the linked articles on Kristine Galemmo to gain some insight on the kind of person you have in charge of your first graders. No doubt you had no idea what you were getting as this lady is a chameleon who personifies the word 'manipulative'. She probably blew you away in her interviews. Be wary.

A victim of her and her husbands skullduggery.

http://www.bizjournals.com/cincinnati/news/2013/07/24/cincinnati-money-manger-accused-of.html

http://www.bizjournals.com/cincinnati/news/2013/11/14/lawyers-interview-galemmos-wife-about.html

http://www.wcpo.com/news/crime/glen-galemmo-to-be-sentenced-in-multimillion-dollar-ponzi-scheme

    How ironic that a person completely devoid of a moral compass is teaching young children in a Catholic school.

—
God Bless,

Sally Barker
Principal
St. Anthony Padua Catholic School
311 Gower St.
Greenville, SC 29611
www.stanthonygreenvillesc.org

Exhibit 8



kris galemmo <kegalemmo@gmail.com>

## United States vs. Glen Galemmo
1 message

**Kristin Ayler** <pup24pup@aol.com>
To: kgalemmo@stanthonygreenvillesc.org
Cc: sbarker@stathonygreenvillesc.org

Wed, Aug 26, 2015 at 6:53 PM

Kris,

I would not normally reside to sending something to you at home let alone at work. In fact, I have remained silent thru this whole ordeal with you and Glen given that Glen too was my friend. One of the first persons I met when I arrived here in Cincinnati. I considered him a friend. Like many.

However, today we received in the mail notice that the final forfeiture order was signed by the court on August 10, 2015 and that maybe just maybe the people Glen and yourself affected might see some slim chance of money come back their way. Only to find out that YOU have appealed that final order. Of course pushing this back 6 months or more. While I'm sure this is by advice of your attorney, I was still shocked and felt the need to reach out.

Obviously this ponzi scheme affects everyone involved. Investors, you, your children and your immediate families. Your husband made a poor decision but I find it hard to believe that with all those accounts in YOUR NAME you had no idea what was going on. You plead the 5th right? Say no more. Therefor many hold you responsible and accountable as you know.

Glen has been dealt his fate. I would think given all that has gone on you would just stand tall and let the process run it's course. Let these Investors feel some sort of relief/gratitude/restitution...whatever it may be and not fight it. While you may not care what others think of you....as a mother, I would care what my children think of me and how I handled this situation you were put in. Considering you are all they have to look up to now.

We have moved on. We will probably never see a dime and that's okay. I have finally forgiven. We took a huge hit. 2014 was a horrible year for us but I have my family and we are healthy and happy. We are honest, true and true to our word. We teach our children all these values. Make no mistake....we make mistakes but we don't cheat and lie...that is a choice.

Exhibit 8

 Gmail                                    kris galemmo <kegalemmo@gmail.com>

## Fwd: Kristine Galemmo
4 messages

---

**DanceArts Greenville** <office@danceartsgreenville.com>             Mon, May 23, 2016 at 12:26 PM
To: Kris Galemmo <kegalemmo@gmail.com>

Wanted you to have this 1 of 2 emails.
Mary

Begin forwarded message:

> **From:** Kristin Ayler <pup24pup@aol.com>
> **Subject: Kristine Galemmo**
> **Date:** May 23, 2016 at 12:13:38 PM EDT
> **To:** office@danceartsgreenville.com
>
> You do realize that Kristine Galemmo and her husband Glen Galemmo have ongoing litigations
> against them for defrauding investors for over $1 Million Dollars? Kristine was very much a part of
> this.
>
> Wanted you aware of her situation since you employ her.

---

**DanceArts Greenville** <office@danceartsgreenville.com>             Mon, May 23, 2016 at 12:26 PM
To: Kris Galemmo <kegalemmo@gmail.com>

email 2 of 2

Mary

Begin forwarded message:

> **From:** Kristin Ayler <pup24pup@aol.com>
> **Subject: Kristine Galemmo**
> **Date:** May 23, 2016 at 12:15:58 PM EDT
> **To:** office@danceartsgreenville.com
>
> I'm sorry...that amount was more like $20 Million!
>
> While the rest of us lost money to them (their kids are in private schools, multi vehicle family, etc)
> money we saved for retirement that is....she seems to be doing just great moving on while her
> husband is in Prison for next 15 years

---

Exhibit 8



When Christmas arrives during your first of many years behind bars you might consider asking Santa for a conscience. Ask him to provide your spouse with one as well. Somewhere along the line you both lost or misplaced your moral compass. I pity your offspring.

Exhibit 8

**QC POWER STRATEGIES TRADING**

**Total Revenue**    $   3,983,830.42

| Date | Description | Debits | | Credits | |
|---|---|---|---|---|---|
| 1/23/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 42,783.34 |
| 1/7/2013 | PJMSETTLEMENTINCDEBITS | $ | 16,227.52 | | |
| 1/11/2013 | PJMSETTLEMENTINCDEBITS | $ | 10,044.78 | | |
| 1/25/2013 | PJMSETTLEMENTINCDEBITS | $ | 14,848.98 | | |
| 2/5/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 125,091.61 |
| 2/12/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 102,285.99 |
| 2/20/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 136,400.72 |
| 2/26/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 148,801.49 |
| 3/5/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 77,443.20 |
| 3/8/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 116,869.52 |
| 3/12/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 200,071.83 |
| 3/26/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 84,877.43 |
| 4/2/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 135,337.16 |
| 4/9/2013 | PJMSETTLEMENTINCCREDITS | | | $ | 76,655.69 |
| 4/23/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 107,436.31 |
| 4/30/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 192,896.40 |
| 4/12/2013 | PJMSETTLEMENTINCDEBITS | $ | 26,569.48 | | |
| 5/7/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 189,693.92 |
| 5/21/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 186,870.77 |
| 5/29/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 191,758.16 |
| 5/10/2013 | PJMSETTLEMENTINCACHDRAFT | $ | 28,041.26 | | |
| 6/4/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 278,862.46 |
| 6/11/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 339,862.72 |
| 6/18/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 414,895.06 |
| 6/25/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 148,584.94 |
| 7/2/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 302,433.54 |
| 7/10/2013 | PJMSETTLEMENTINCPAYMENTS | | | $ | 411,959.42 |
| | | $ | 28,041.26 | $ | 4,011,871.68 |

Exhibit 9